FIRST UNION NATIONAL
BANK, Plaintiff,

v.

PARIBAS, f/k/a Banque
Paribas, Defendant.

First Union National Bank, Plaintiff,

v.

Anz Grindlays Bank, Defendant.

First Union National Bank, Plaintiff,

v.

Emirates Bank International,
Defendant.

First Union National Bank, Plaintiff,

v.

Arab African International
Bank, Defendant.

Nos. 00 Civ. 5397(LAK), 00 Civ.
5398(LAK), 00 Civ. 5400(LAK),
00 Civ. 5401(LAK).

United States District Court,
S.D. New York.

March 21, 2001.

Lawrence E. Miller, Mark L. LoSacco, LeBoeuf, Lamb, Greene & MacRae, LLP, New York City, for Plaintiff.

Martin Domb, John F. Keating, Jr., Hill, Betts & Nash LLP, New York City, for Defendants BNP Paribas, ANZ Grindlays Bank and Emirates Bank International.

David W. Rifkin, Suzanne M. Grosso, Debevoise & Plimpton, New York City, for Defendant Arab African International Bank.

## MEMORANDUM OPINION

KAPLAN, District Judge.

These cases have their origins in what appears to have been a massive fraudulent scheme perpetrated in London that now is under investigation by the Serious Fraud Office of the London police, has resulted in a number of arrests, and has led to extensive litigation there.

The essence of the scheme appears to have been as follows: A Middle Eastern corporation known as Solo Industries Limited ("Solo") applied to many banks, chiefly located in the Middle East, for deferred payment letters of credit ("LCs") in favor of a U.K. based company, Simetal Limited ("Simetal"), ostensibly to finance Solo's purchase of high value non-ferrous metals and alloys from Simetal. Banks located in London, including plaintiff's London branch, confirmed the LCs. Simetal then presented the required documents to the London confirming banks in advance of the maturity dates of the LCs. Many—including the plaintiff's London branch—discounted the letters, evidently in reliance on the obligations of the issuing banks to pay the full amounts of the letters upon their maturity, and made substantial payments to Simetal.

In the spring of 1999, Solo collapsed, leaving more than 20 banks, including the defendants here, facing losses aggregating more than $300 million—assuming that they are liable to plaintiff and the other confirming banks. The Court is advised, however, that evidence has been developed that suggests that bills of lading and other documents presented by Simetal to plaintiff and presumably other confirming banks were fraudulent in that they misstated the quality and quantity of the goods actually shipped. A number of issuing banks, including the defendants in this case, dispute their liability to the confirming banks on the basis that the confirming banks knew of or deliberately turned a blind eye toward the fraudulent activity before they discounted the LCs and there-

fore have no claims against the issuing banks.

There has been extensive activity in London concerning this situation for almost two years. Indeed, until shortly before these actions were commenced, it was assumed among the English counsel for these parties that this litigation would be brought in London. On February 25, 2000, however, the English Court of Appeal decided *Banco Santander, S.A. v. Banque Paribas,*[1] in which it held that a confirming bank that discounts a deferred payment letter of credit in advance of maturity becomes the assignee of the claim of the beneficiary against the issuing bank and therefore is subject to whatever defenses the issuer may have against the beneficiary. This suggests that the issuing banks would be entitled to assert Simetal's alleged fraud as a defense to the claims of the confirming banks with respect to the LCs. In consequence, plaintiff rapidly shifted ground and brought these actions in New York, where it argues that New York law should govern and seeks to avoid the impact of the *Banco Santander* case. Defendants move to dismiss on the ground, among others, of *forum non conveniens.*

### I

The essentials of the dispute already have been outlined. It remains to sketch in somewhat greater detail the facts pertinent to resolution of the *forum non conveniens* issue.

### A. Parties

Plaintiff First Union National Bank is a national bank headquartered in Charlotte, North Carolina. It does business, however, all over the world and has a branch office in London. Almost all of its personnel involved in the matters at issue are in the United Kingdom.

Defendants all are banks organized under the laws of foreign nations other than the United Kingdom.

### B. The Letters of Credit

In March and April 1999, the Sharjah and Dubai branches of the defendant banks issued dollar-denominated, deferred payment LCs[2] at the request of Solo and M/S Zeeba Metal Company, Inc., both companies owned by one Madjeb Patel. The letters ostensibly were issued to finance purchases of metals of Russian origin from Simetal. Accordingly, Simetal was named as the beneficiary on each. Each of the LCs was addressed to, and provided that it was available with, plaintiff's London branch ("FUNB–London"). Each provided for payment 180 days after the presentation of documents. Some requested and others permitted confirmation by FUNB–London, and FUNB–London confirmed all of them. Each authorized FUNB–London to obtain reimbursement by drawing dollars from the issuer's account at a New York City bank.[3]

Shortly after the issuance of each LC, Simetal presented to FUNB–London the bills of lading and other documents required by it. In each case, FUNB–London forwarded the documents to the issuer with a cover letter stating that the presentation of documents complied with the LC

---

1. 1 All E.R. (Comm.) 776 (2000).

2. Deferred payment letters of credit provide for payment a stated period of time after presentation of all required documents rather than upon presentation thereof. They are a comparatively recent innovation. *Banco Santander,* 1 All E.R. (Comm.) 776.

3. Klein Decl. Ex. A–D (Emirates Int'l); Refai Decl. Ex. A (AAIB); Moussalli Decl. Ex. A (Paribas); Thomas Decl. Ex. A(ANZ).

and that FUNB–London intended to claim reimbursement on the maturity date, i.e., 180 days after Simetal's presentation of the documents to FUNB–London.[4] According to FUNB–London, however, it "transferred or otherwise credited to Simetal" a discounted amount on the same day that it forwarded the documents to the issuer. Thus, although FUNB–London neither was obligated to nor requested by the issuer to pay Simetal until the maturity date, FUNB–London voluntarily chose to discount each drawing by paying or crediting to Simetal's account a discounted amount. According to defendants, moreover, FUNB–London did not notify the issuers that it had done so.

## II

 The analysis of *forum non conveniens* motions requires consideration of whether there is an adequate alternative forum [5] and, if so, a balancing of "a series of private and public interests in determining whether to retain the case or dismiss it in favor of [the] alternative forum." [6]

### A. Private Interest Factors

 No one disputes that England is an adequate alternative forum.[7] The Court therefore turns to the so-called "private interest factors," first among them being the oft-stated principle that a plaintiff's choice of forum is entitled to substantial deference and should not be disturbed lightly.[8]

### 1. Plaintiff's Choice of Forum

The parties here join issue with respect to the degree of deference that should be accorded to plaintiff's choice of this forum. Defendants acknowledge that substantial weight ordinarily is due to a plaintiff's choice of forum. They acknowledge, of course, that plaintiff is a United States citizen, and they do not seriously dispute that even greater deference usually must be shown to the choice of a U.S. forum by such a plaintiff.[9] But they argue that the weight to be accorded to this plaintiff's choice of this forum is undercut by the fact that this case concerns exclusively the operations of plaintiff's London branch relating to business having no substantial contact with the United States. It cites, among other cases, *Sussman v. Bank of Israel* for the proposition that the weight accorded to "citizenship as a talisman against forum non conveniens dismissal is diminished" where the plaintiff "chooses to

---

4. Klein Decl. Ex. E; Refai Decl. Ex. B.

5. *E.g., Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 56 (2d Cir.2000); *see American Dredging Co. v. Miller,* 510 U.S. 443, 447–48, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994); *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 506–07, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

6. *Manela v. Garantia Banking Ltd.,* 940 F.Supp. 584, 590 (S.D.N.Y.1996) (quoting *Ioannides v. Marika Maritime Corp.,* 928 F.Supp. 374, 377 (S.D.N.Y.1996)) (internal quotation marks omitted); *accord, e.g., American Dredging Co.,* 510 U.S. at 447–48, 114 S.Ct. 981 (quoting *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839).

7. *E.g., Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 101 (2d Cir.2000) ("British courts ... exemplary in their fairness and commitment to the rule of law"), *petition for cert. filed,* —— U.S. ——, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001); *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.1993) ("United States courts consistently have found [English courts] to be neutral and just forums."), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993).

8. *E.g., Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839; *DiRienzo,* 232 F.3d at 56–57, 60.

9. *E.g., Wiwa,* 226 F.3d at 101.

invest in a foreign country and then complains of fraudulent acts occurring primarily in that country." [10] Plaintiff rejoins that an American citizen rarely should be denied access to American courts under the doctrine of *forum non conveniens* and asserts that this is even more clearly true where, as it claims is the case here, the wrong complained of—the non-payment of the defendants by plaintiff—occurred in New York. There is much to be said for the positions of both sides on this issue.

■ Plaintiff certainly is right in saying that a U.S. forum should not lightly be denied to a U.S. citizen on the basis of *forum non conveniens*. Indeed, "[f]or generations it had been the inflexible New York rule that if any party to the lawsuit was a New York resident, the doctrine of *forum non conveniens* was inapplicable." [11] But that no longer is the law of New York,[12] and it most assuredly is not the law applicable in federal courts.[13] Hence, while the citizenship of the plaintiff is important, it is not dispositive.

Defendants, on the other hand, surely are right in saying that there is little sense to allowing a U.S. citizen to haul a group of foreign defendants into a U.S. court on transactions having little or nothing to do with this country where there is an available foreign forum significantly better suited to handling the litigation in a prompt, efficient and effective manner. As the Second Circuit only recently reminded, the deference due to the choice of a U.S. forum by a U.S. plaintiff is not attributable to "chauvinism or bias in favor of U.S.

---

**10.** 801 F.Supp. 1068, 1073 (S.D.N.Y.1992), *aff'd,* 990 F.2d 71 (2d Cir.1993).

**11.** Joseph M. Laughlin, *Practice Commentaries,* 7B McKinney's Consolidated Laws of New York C.P.L.R. 301 to 500, at 595 (1990).

**12.** *Silver v. Great Am. Ins. Co.,* 29 N.Y.2d 356, 328 N.Y.S.2d 398, 278 N.E.2d 619 (1972).

**13.** *Wiwa,* 226 F.3d at 101–02 (no "rigid rule of decision protecting U.S. citizen or resident plaintiffs from dismissal for *forum non conveniens*").

Parenthetically, it might be noted that there is a circuit conflict on the question whether *forum non conveniens* is governed by federal or state law in a diversity case and, indeed, some conflict between Second Circuit cases. *Compare Weiss v. Routh,* 149 F.2d 193, 195 (2d Cir.1945) (state law governs), *with Rivendell Forest Prods., Ltd. v. Canadian Pac. Ltd.,* 2 F.3d 990, 992 (10th Cir.1993) (federal law); *Royal Bed & Spring Co. v. Famossul Industria e Comercio de Moveis, Ltda.,* 906 F.2d 45, 50 (1st Cir. 1990) (same); *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d 1147, 1159 (5th Cir.1987) (en banc) (same), *vacated on other grounds,* 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989), *prior opinion reinstated in relevant part,* 883 F.2d 17 (5th Cir.1989);

*Sibaja v. Dow Chem. Co.,* 757 F.2d 1215, 1219 (11th Cir.) (same), *cert. denied,* 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985); *Miller v. Davis,* 507 F.2d 308, 316 (6th Cir.1974) (same); *and Schertenleib v. Traum,* 589 F.2d 1156, 1162–63 n. 13 (2d Cir.1978) (issue open in Second Circuit). This point is immaterial here for two reasons. First, the New York law of *forum non conveniens* is virtually identical to the federal law, as evidenced by the New York Court of Appeals' frequent reliance on federal authorities in resolving such cases. *E.g., Islamic Republic of Iran v. Pahlavi,* 62 N.Y.2d 474, 478–81, 478 N.Y.S.2d 597, 599–601, 467 N.E.2d 245 (1984), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985); *Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd.,* 62 N.Y.2d 65, 73, 476 N.Y.S.2d 64, 68, 464 N.E.2d 432 (1984); *Varkonyi v. S.A. Empresa De Viacao Airea Rio Grandense (Varig),* 22 N.Y.2d 333, 338, 292 N.Y.S.2d 670, 673–74, 239 N.E.2d 542 (1968); *see* David D. Siegel, New York Practice § 28 (3d ed. 1999 & Supp.2000). Second, the parties have briefed the motions on the premise that federal law controls and thus consented to its application. *See Santalucia v. Sebright Transp., Inc.,* 232 F.3d 293, 296 (2d Cir.2000); *Tehran–Berkeley Civil & Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989).

residents." [14] Rather, it reflects the fact that "the greater the plaintiff's ties to the plaintiff's chosen forum, the more likely it is that the plaintiff would be inconvenienced by a requirement to bring the claim in a foreign jurisdiction." [15]

■ In the last analysis, it always must be borne in mind that there is no algorithm that assigns precise weights to the factors that inform *forum non conveniens* determinations. The doctrine instead is intensely practical and fact-bound. The most that may be said is that courts reach informed judgments after considering all of the pertinent circumstances. While plaintiff's citizenship surely is a strong factor in its favor, its impact ultimately may be outweighed by a sufficiently robust showing in favor of an alternative forum. And to state the converse of the Second Circuit's recent comment, it simply stands to reason that the weaker the connection between a plaintiff's U.S. activities, even those of a U.S. plaintiff, and the events at issue in the lawsuit, the more likely it is that defendants attacking the plaintiff's choice of a U.S. forum will be able to marshal a successful challenge to that choice. So the Court turns to the remaining private interest factors, which include such matters as the relative ease of access to sources of proof, availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses, and other practical considerations that make trial of a case easy, expeditious and inexpensive. [16]

### 2. Access to Sources of Proof

There appears to be a great deal of documentary evidence pertinent to this dispute. This includes material in the possession or control of the parties as well as shipping records relating to Simetal's alleged fraud. In addition, the investigations in England have generated tens of thousands of pages of documents of likely relevance, including documents seized by British authorities in a raid on Simetal's London office and other materials obtained in a so-called *Norwich Pharmacal* proceeding in an English court. [17] Most all of these documents now are in London. Few are in the United States.

### 3. Cost of Obtaining Willing Witnesses

Defendants have presented a list of 39 likely willing witnesses in this matter, almost all of whom are located in England and the Middle East. None is from the United States.

Plaintiff attacks the list, arguing that seven of those included are its own U.K. employees whom it will make available in the United States, that six are investigators with no first hand knowledge of the fraud, and that one is a retained expert. At the end of the day, they say, there are only three likely witnesses resident in England: the witnesses from the Middle East will have to make lengthy journeys no matter where the case is tried, and there is no material difference between London and New York. Moreover, plaintiff argues that it will aid in reducing the

---

14. *Wiwa*, 226 F.3d at 102.

15. *Id.*

16. *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Manela* v. *Garantia Banking, Ltd.*, 940 F.Supp. 584, 591 (S.D.N.Y.1996).

17. The *Norwich Pharmacal* proceeding was a vehicle by which a group of eight banks, including some of the defendants here, obtained an order in the English High Court of Justice, requiring plaintiff to disclose documents relating to accounts held at FUNB's London branch in the names of companies and individuals involved in the fraud. Roderick Decl. ¶¶ 25–32 & Ex. E.

travel costs by deposing the witnesses in convenient locations.[18]

Plaintiff is right in suggesting that there has been a certain amount of puffery in the construction of defendants' list. It is not entirely clear, for example, why the various investigators are likely to testify as opposed to providing information concerning the identity and location of persons with knowledge of the facts. And the location of defendants' retained expert is entitled to little if any consideration in the analysis.[19] In the last analysis, however, two things are clear. First, there are few if any potential witnesses in New York or, for that matter, in the United States—indeed, although plaintiff has not conceded the point, it has identified none at all. Second, substantially all of the likely willing witnesses reside either in England or in the Middle East, and there simply is no denying the fact that the cost and inconvenience for these individuals of a trial in London would be far less than that of a trial in New York.

*4. Availability of Compulsory Process*

Neither side has identified any witness resident within the subpoena power of this Court who would testify only pursuant to compulsory process. Defendants, on the other hand, assert that a number of the non-party witnesses identified on their list probably would not testify willingly and could be subpoenaed for trial only in Eng-

land. Given the size of the alleged fraud and the active investigations by law enforcement authorities, it seems quite likely that they are right. This is particularly true of David Lendon, plaintiff's former account officer for the Simetal and related accounts, and Milton Kounnou, the principal of Simetal and the related account holders.

Plaintiff first seeks to minimize the implications of this fact by pointing to this Court's decision in *Manela v. Garantia Banking Ltd.,*[20] where it denied a *forum non conveniens* motion in part because the defendant had failed to allege or produce evidence that a key non-party foreign witness would be unwilling to testify in New York. But they overlook the fact that there was no criminal investigation providing a major disincentive to voluntary testimony in *Manela.* Moreover, the witness in question was a former employee of the defendant and thus perhaps presumptively available to it upon request.[21]

Plaintiff next argues that the deposition testimony of unwilling witnesses in England could be obtained by compulsory process issued by an English court pursuant to the Hague Evidence Convention,[22] to which the United Kingdom is a party. But plaintiff misses the key point and overstates a subsidiary one. The focus on the availability of compulsory process for unwilling witnesses reflects a strong preference for live trial testimony.[23] Unwilling

**18.** It no doubt would be required to do so under established law. *See* FED. R. CIV. P. 45(c).

**19.** *See Magnetic Eng'g & Mfg. Co. v. Dings Magnetic Separator Co.,* 86 F.Supp. 13, 17 (S.D.N.Y.1949) ("The residence of expert witnesses cannot be considered as controlling, or even of great importance, in determining questions of *forum non conveniens.*"), *modified on other grounds and appeal dismissed as to transfer order,* (178 F.2d 866 (2d Cir.1950)).

**20.** 940 F.Supp. 584, 592–93 (S.D.N.Y.1996).

**21.** *Id.* at 592 & n. 14.

**22.** Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *opened for signature,* Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, 8 I.L.M. 37 (1969); 28 U.S.C.A. § 1781.

**23.** *Allstate Life Ins. Co. v. Linter Group, Ltd.,* 994 F.2d 996, 1001 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993); *Schertenleib v. Traum,* 589 F.2d 1156, 1165 (2d Cir.1978).

English witnesses could be compelled to testify in person only if the trial were held in England. And even if depositions in theory might be an acceptable substitute for live testimony, adequate depositions of unwilling witnesses would be difficult or impossible to obtain under the Convention. British reservations to the Convention make it unavailable as a means of obtaining pretrial discovery as distinct from trial testimony.[24] It therefore is reasonable to suppose that an unwilling witness would challenge any effort to take the witness' testimony as forbidden discovery.[25] Even if unsuccessful in blocking a deposition altogether, the witness would be entitled to insist upon adherence to English trial procedure, which forbids impeachment by the party calling the witness.[26] Finally, documents cannot be requested by class. Individual documents must be described specifically and individually.[27] In sum, insisting on a trial in New York unquestionably would deprive the finder of fact of the live testimony of unwilling English witnesses and quite likely would deprive it of a meaningful substitute in the form of depositions.

### 5. Other Considerations

Finally, defendants quite accurately point out that their English counsel have been heavily involved in this dispute for over one year as, indeed, appears to be true also of plaintiff's English counsel. Plaintiff has foresworn, for itself, any inconvenience of having New York counsel educate themselves in this complex matter. But it is perfectly apparent that the retention of this case in New York will subject the defendants to needless expense involved in bringing new attorneys into the intricacies of this complicated transnational litigation.

It is apparent also that extensive litigation concerning these matters and involving the plaintiff will go forward in England in any event. Arab Banking Corporation ("ABC"), Bank of Muscat ("BM") and Emirates Bank International ("EBI") have sued plaintiff in England concerning the very same matters.[28] ABC and BM are not parties here, so those cases will go forward no matter what, and EBI may seek to press its London suit even if these cases proceed here. Interests in consistency and efficiency argue in favor of having all of this litigation in one place.[29]

### B. Public Interest Factors

■ As laid out in *Gilbert*, the public interest factors are as follows:

"[f]actors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having

---

24. Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, n. 31.

25. *See Re Norway's Application*, [1987] 1 QB 433; Roderick Decl. ¶ 37(a).

26. Roderick Decl. ¶ 37(b).

27. *Id.* ¶ 37(d); *Rio Tinto Zinc v. Westinghouse Elec. Corp.*, [1978] AC 547.

28. Hunter Decl. Exs. A–C.

29. *See MGN Pension Trustees v. Morgan Stanley Trust Co.*, 947 F.Supp. 611 (E.D.N.Y. 1996).

localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." [30]

The chief points of contention concerning the public interest factors are whether New York or English law governs the cases and whether the United States has any real interest in providing a forum for this controversy beyond the fact of plaintiff's citizenship.

Plaintiff contends that "each defendant had only one explicit obligation to [it]—to pay U.S. dollars to First Union in New York." [31] Based on this premise, it argues that "the breach at issue—the failure to reimburse the confirming bank—took place in New York" [32] and, further, that New York law governs here under *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Limited* [33] because New York was the place of payment. [34] Contrary to plaintiff's repeated misstatements, however, none of the LCs. required payment in New York, and none limited FUNB–London's claim against its issuer to the specified New York account. [35] Moreover, there are least two significant distinctions between the *Zeevi* case upon which plaintiff places such heavy reliance and this one.

*Zeevi* involved a letter of credit issued by a Ugandan bank in favor of an Israeli beneficiary. The LC authorized the negotiating bank to claim reimbursement from the issuer's account in New York. The defendant, pursuant to a subsequent Ugandan government directive, then instructed its New York bank not to pay on the LC. The issuer's New York bank in turn rejected a number of drafts on the LC presented to it by another New York bank. The beneficiary then sued the Ugandan issuing bank in New York for breach of contract. The New York Court of Appeals held that the cause of action arose in New York, giving it jurisdiction under New York's Banking Law, because "New York was the locus of repudiation, whereas it should have been a site of payment." [36] Applying the familiar New York interest analysis, the court then held that New York law governed the beneficiary's action against the issuer because New York had a great interest in applying its own law to the dispute "[i]n order to maintain its preeminent financial position." [37] In reaching the first of these conclusions, it focused on the fact that the "defendant's order countermanding payment by cable and letter took effect upon receipt by Citibank in New York and then gave rise to a cause of action here." [38]

While New York's interest as "a finan-

---

**30.** *Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839.

**31.** Pl. Mem. at 3.

**32.** *Id.* at 9.

**33.** 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168, *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975).

**34.** Pl. Mem. at 10–12.

**35.** Of course, the letters of credit contemplated payment from the New York accounts.

But plaintiff has blinded itself to the distinction between permitting or contemplating payment in New York and requiring it, a distinction that has proved dispositive in other contexts. *E.g., Dar El–Bina Eng. & Contracting Co. v. Republic of Iraq*, 79 F.Supp.2d 374, 382 (S.D.N.Y.2000) (collecting cases).

**36.** 37 N.Y.2d at 226–27, 371 N.Y.S.2d at 897–98, 333 N.E.2d 168.

**37.** *Id.*

**38.** *Id.* at 226, 371 N.Y.S.2d at 897, 333 N.E.2d 168.

cial capital of the world"[39] argues for the application of New York law here, and while it is arguable that the "locus of repudiation" in the sense that the *Zeevi* court used the phrase was here as well,[40] these cases involve an additional factor altogether—what appears to be a quite substantial fraud defense. The alleged fraud, indeed, is the dominant feature of the litigation, and it has no perceptible contacts with New York or the United States. It is arguable that this fraud defense would be governed by the same law as the LCs.[41] Nonetheless, it is entirely possible that English law either would govern both issues or would govern the fraud defense even if New York law otherwise governed the LCs themselves.[42]

There is another difference. In *Zeevi*, the plaintiff was the beneficiary of the LC, who was injured when the issuer's New York agent refused to pay drafts presented to it in New York. Here, on the other hand, the plaintiff, in any practical sense, is the London branch of the confirming bank, which was injured in the first instance in consequence of the fraud perpetrated on it in London by the English beneficiary. Thus, while there are similar-

ities here to the *Zeevi* case that cut in favor of application of New York law to the LC issues, there also are differences that cut in the opposite direction.

In the last analysis, it is premature to make a definitive choice of law ruling both because it is not yet clear that there is a conflict between New York and English law[43] and because the litigation is at a preliminary stage.[44] What may be said is that there is at least some likelihood that this Court, if it retained the cases, would be obliged to apply English law to part of or to the entire case, a factor that cuts to some degree in defendants' favor. An English court, on the other hand, would apply its own law to the entire dispute.

Finally, there is the matter of the whether the burden of this litigation fairly ought to be imposed on our judges and juries. This Court is quite mindful, as was the New York Court of Appeals in resolving the choice of law issue in *Zeevi*, of the importance to New York, as a world financial capital, of providing a forum in which "the justified expectations of the parties to" international letter of credit business may be enforced.[45] But that interest is

**39.** *Id.* at 227, 371 N.Y.S.2d at 898, 333 N.E.2d 168.

**40.** The issue arose in *Zeevi*, however, in the context of a jurisdictional rather than a choice of law analysis.

**41.** *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540–41 (2d Cir.) (reviewing New York cases and concluding that, under New York's conflict of law rules, a breach of contract claim and an affirmative defense such as fraudulent inducement are governed by the law of the same jurisdiction), *cert. denied*, 522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997).

**42.** *See Morgan Guaranty Trust Co. of New York v. Republic of Palau*, 693 F.Supp. 1479, 1494–95 (S.D.N.Y.1988) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786 (2d Cir.1980)).

**43.** *E.g., Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998) (noting that under New York choice of law principles, a court will not undertake a choice of law analysis if there is no conflict); *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993); *J. Aron & Co. v. Chown*, 231 A.D.2d 426, 647 N.Y.S.2d 8 (1st Dept. 1996) (no conflict between law of New York and law of Newfoundland).

**44.** *E.g., Manela v. Garantia Banking Ltd.*, 940 F.Supp. 584, 595 (S.D.N.Y.1996).

**45.** *Schuster v. Dragone Classic Motor Cars, Inc.*, 67 F.Supp.2d 288, 292 (S.D.N.Y.1999); *Zeevi*, 37 N.Y.2d at 227, 371 N.Y.S.2d at 898, 333 N.E.2d 168.

not a trump to be played whenever a party to such a transaction seeks to use our courts for a lawsuit with little or no apparent contact with New York or the United States. As the Appellate Division recently recognized, the existence of a letter of credit with some tangential connection to New York does not alone require the denial of a *forum non conveniens* dismissal, particularly where there is an adequate alternative forum in which related litigation is pending.[46] Here, the litigation and related activity concerning the Simetal fraud is centered in London. The English courts are eminently capable of dealing with this litigation. The choice here is not between a U.S. District Court and a forum of debatable competence and fairness.

### III

In drawing these strands together, we begin with the strong presumption in favor of this U.S. plaintiff's choice of a U.S. forum. As the Court of Appeals has made clear, however, that presumption in some sense is a proxy for the convenience usually to be had by a U.S. plaintiff in litigating at home. Here, it would be wrong to overlook the fact that this plaintiff is not in any practical sense seeking to litigate at home. These lawsuits have arisen out of the activities of its permanent branch in London. All or substantially all of its employees knowledgeable about the disputes reside there. In consequence, while defendants cannot rely on inconvenience to plaintiff of litigating in New York in support of their effort to have the cases pursued elsewhere, the fact that plaintiff's convenience interests are not served significantly by litigating here do diminish somewhat the deference to be accorded to their selection of this forum. And the deference due their choice is the only factor favoring retention of these cases here. The proof all is in London or closer to London than to New York. London is a more convenient location for the defendants and for all of the witnesses from the Middle East and Europe. There is at least a possibility that this Court would be obliged to apply English law to at least part of the dispute.[47] Most significantly, this Court has no ability to compel the testimony of unwilling witnesses whereas the English High Court enjoys that power with respect to witnesses on British soil. And the utterly tangential relationship of this dispute to the United States makes the imposition of the burden of these cases on U.S. jurors, courts, and taxpayers inappropriate. The deference due plaintiff's choice of this forum is quite substantially overborne by the considerations favoring trial in London.[48]

Accordingly, the motions of the defendants to dismiss these cases on the ground of *forum non conveniens* are granted provided that the dismissal of each of these cases is conditioned upon the defendant therein, on or before March 28, 2001, filing with the Clerk a document (a) consenting to the exercise of personal jurisdiction over

---

46. *World Point Trading PTE, Ltd. v. Credito Italiano*, 225 A.D.2d 153, 161, 649 N.Y.S.2d 689 (1st Dept.1996) (directing *forum non conveniens* dismissal of letter of credit case in favor of Italian forum in which related litigation was pending).

47. The Court would reach the same result irrespective of whether it would be obliged to apply English law.

48. The parties urge the Court to decide whether to give issue preclusive effect to the British Commercial Court's recent rejection of a motion by First Union to stay proceedings against it on the grounds that New York was a more appropriate forum. *Arab Banking Corp. v. First Union Nat'l Bank*, 200 Folio 1298. Given that the Court's holding is consistent with that decision, it is unnecessary to reach this point.

them by the English courts in London in an action by plaintiff on the claims asserted in the complaint herein, (b) appointing a firm or individual resident in London its agent for the receipt of service of process in such an action, and (c) representing that it will not assert or rely upon the passage of time from the date of commencement of plaintiff's action against it in this Court to and including May 28, 2001 by way of defense based in whole or in part on the timeliness of an action against it by plaintiff in London on the claims asserted in the complaint herein. Upon the filing of such a document in a given case, the Clerk shall enter final judgment and close that case.

SO ORDERED.