Joseph P. LaSALA and Fred S. Zeidman, as Co–Trustees of the Aremissoft Corporation Liquidating Trust, Plaintiffs,

v.

UBS, AG, Defendant.

No. 06 Civ. 1736(CSH).

United States District Court, S.D. New York.

Aug. 15, 2007.

Barry A. Weprin, January Leigh Kerr, Milberg, Weiss, Bershad & Schulman LLP, New York City, for Plaintiffs.

Mark Hanchet, Mayer, Brown, Rowe & Maw, LLP, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, *Senior District Judge.*

In this diversity action, plaintiffs seek to hold defendant UBS, AG ("UBS" or "the bank") responsible for its alleged role in connection with a massive "pump and dump" scheme perpetrated by two corporate insiders of a software company, who fraudulently inflated the company's value and then sold their shares and funneled these funds through banks in Switzerland and elsewhere. In this motion defendant seeks to dismiss the complaint on three separate grounds: (1) *forum non conveniens;* (2) preemption of the claims by the Securities Litigation Uniform Standards Act, 15 U.S.C. §§ 77, 78 ("SLUSA"); and (3) failure to state a claim upon which relief may be granted pursuant to Fed. R.Civ.P. 12(b)(6). For the following reasons, I dismiss the complaint on the ground of *forum non conveniens.*

## I. BACKGROUND

### A. *Factual Background*

Much of the following account is drawn from the complaint, whose well-pleaded factual allegations are taken as true on this motion. AremisSoft Corporation ("AremisSoft" or "the Company") was a software company, incorporated in Delaware. From about 1998 through July of 2001, Lycourgos Kyprianou and Roys Poyiadjis, two Cypriots who were officers of the Company,[1] caused the Company to is-

---

1. Kyprianou was AremisSoft's founder and served as Chairman of the Board of Directors from October 1997, and served as co-CEO with Poyiadjis from February 2001 to July 31,

sue false public statements and regulatory filings representing to the public that it was experiencing rapid growth when in fact its growth nowhere neared the stated revenues. Compl. ¶ 2. The two men caused AremisSoft to announce publicly that it had acquired other software companies of significant value, when, in reality, the companies were small and had been acquired for much less than the announced price. They fabricated records in support of these falsehoods. *Id.*

The effect of these fraudulent misrepresentations was that the value and profitability of the Company were perceived to be much greater than they actually were, and consequently the price at which the Company's shares were traded on the open market was artificially high. Kyprianou and Poyiadjis sold their shares at these inflated prices to investors who were not privy to their knowledge concerning the true value of the Company. In order to give the impression that their stock sales were arm's length sales by other investors, the two corporate insiders devised a money laundering scheme, employing various entities to hold and sell their AremisSoft stock. When the truth about the Company was revealed, the value of the stock plummeted, and investors suffered great losses. By the time the fraud was exposed in the summer of 2001, the investing public had sustained losses of approximately $500 million. *Id.* ¶ 3. On or about March 15, 2002, AremisSoft filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. *Id.* ¶ 7.

## B. *The Parties*

Neither of the swindlers, whose acts of fraud and theft are undisputed, is a party to this case. Kyprianou is in Cyprus, and

Poyiadjis is awaiting sentencing in this Court, having pleaded guilty to fraud. *See United States v. Poyiadjis*, 01 Cr. 1177, 2002 WL 1941481 (S.D.N.Y. Aug. 21, 2002) (cited in Pl.'s Mem. in Opp'n, at 9). Defendant UBS is a private Swiss bank through which some of the Cypriots' ill-gotten gains passed. UBS's principal place of business is in Zurich, Switzerland. Compl. ¶ 13.

Plaintiffs are co-trustees of the AremisSoft Corporation Liquidating Trust (the "Trust"), a Delaware trust formed pursuant to three orders by District Judge Pisano of the District of New Jersey in connection with AremisSoft's voluntary bankruptcy: (1) a July 2002 order confirming the First Amended Joint Plan of Reorganization of AremisSoft ("Plan of Reorganization"); (2) an August 2002 order approving a Class Action Settlement, which had settled a consolidated class action brought by former shareholders against AremisSoft; and (3) an August 2002 order correcting the Order and Final Judgment previously entered in respect of AremisSoft's Chapter 11 bankruptcy petition. *Id.* ¶ 7. The governing documents for the Trust are the Plan of Reorganization and the Liquidating Trust Agreement ("Trust Agreement").

This action seeks to pursue some of the claims assigned to the Trust. Under the Plan of Reorganization, the Trust was assigned claims from the Class Action Settlement as well as all of AremisSoft's claims arising pre-bankruptcy. *Id.* ¶ 8. The Trust beneficiaries number over 6,000 persons and entities. *Id.* ¶ 78.

Plaintiffs have already litigated Trust claims abroad. They commenced a chancery action in the Isle of Man against

2001. Poyiadjis served as a director and Chief Financial Officer until September 1999, the Company's President until January 2001, and Co-CEO from February 2001. Compl. ¶¶ 19–20.

Kyprianou, Poyiadjis, and others. *Id.* ¶¶ 79, 80. After more than two years of litigation there, the United States government, the plaintiffs, Poyiadjis, and members of his family and others entered into a Settlement Agreement whereby Poyiadjis agreed to pay approximately $200 million to settle charges against him. *Id.* Plaintiffs maintain that it was through these proceedings that they obtained documents giving rise to their claims in the instant action. *Id.* ¶¶ 83, 84.

### C. *The Allegations Against the Bank*

This case, along with the related cases filed by the plaintiff Trustees against Lloyds TSB, PLC ("Lloyds") and the Bank of Cyprus Public Company Limited ("Bank of Cyprus"),[2] turns on the role of a bank in facilitating the fraud and/or the money laundering of one or both of the swindlers and their co-conspirators. The gravamen of the complaint in this case is that "despite the fact that it was aware that the account [with the Bank] was being used in a manner that was designed to conceal the proceeds of illegal conduct, UBS continued to permit Poyiadjis, Kyprianou, and those acting on their behalf, to use the account to launder money in furtherance of their fraudulent scheme." *Id.* ¶ 6. In the elaborate money laundering scheme described in the complaint, Poyiadjis and Kyprianou would transfer their AremisSoft shares to various entities under their control. *Id.* ¶¶ 125, 126. Some of the banks they dealt with, including Bordier et Cie ("Bordier") and Dominick Company AG ("Dominick"), then assisted in the sale of shares. *Id.* ¶ 127, 130. Next, the proceeds of these sales were transferred among various ac-

counts in Switzerland, including the account at UBS. *Id.* ¶ 128. Finally, approximately $175 million was transferred from these accounts to banks in the Isle of Man, and millions more were transferred to accounts controlled by Kyprianou. *Id.* ¶ 129.

Three entities used for these purposes were called the Trident Trust, Onyx, and Oracle Capital, Inc. The Trident Trust was an Isle of Man trust formed in 2000, whose stated beneficiaries were Poyiadjis family members. *Id.* ¶ 105. Onyx was an entity incorporated in 1998 whose assets formed the corpus of the Trident Trust. *Id.* ¶ 108. Oracle Capital was an entity wholly owned by the Trident Trust. *Id.* ¶ 110. The Trident trustees arranged for Oracle to open an account at UBS. According to documents signed by Bank employees, and submitted in connection with the opening of the account at UBS on February 28, 2001, the beneficial owner of the assets in the account was Roys Poyiadjis's father Spyros Poyiadjis "through THE TRIDENT TRUST." *Id.* ¶ 111. On March 9, 2001, $47 million was transferred from the Onyx account at the Swiss bank Bordier to the UBS account. *Id.* ¶ 121.

The complaint details the transactions leading to that transfer from Bordier as "an illustrative example where the tainted funds passed through the UBS account." *Id.* ¶ 130. It is useful to quote these allegations at some length, because they provide the fullest explanation of UBS's alleged role in the money laundering scheme. The complaint alleges:

(a) As of July 2000, Onyx, controlled by and for the benefit of Roys Poyiadjis, held AremisSoft shares in two certifi-

2. Pursuant to Local Civil Rule 1.6 governing the procedure for an attorney's request that a case be accepted as related to a case pending before a particular judge, this Court has accepted *LaSala & Zeidman v. Lloyds TSB, PLC,* 06 Civ. 4335(CSH), and *LaSala & Zeidman v.*

*Bank of Cyprus Public Company Limited,* 06 Civ. 6673(CSH), as related to the case at bar. All defendants in all three cases have moved on similar grounds to dismiss the complaints. The Court's opinions deciding these three motions are being filed concurrently.

cates ... Each of those certificates had restricted legends on them and thus could not be freely traded.

(b) On September 14, Bartel[3] wrote to the Company's [i.e. AremisSoft's] transfer agent authorizing the removal of the restrictive legends and asking the transfer agent to "reissue a legend-free stock certificate for 779,620 shares." Poyiadjis also wrote to the transfer agent a hand-written note in which he, too, asked that the legends be removed and the shares be returned to him at his New York address. As requested, the transfer agent canceled the two certificates and reissued a new, unrestricted certificate, Certificate No. 1465, in the amount of 779,620 shares.

(c) Poyiadjis then requested, in a hand-written note, that Certificate No. 1465 be broken into two once again, into certificates of 400,000 shares and 379,620 shares, and that the certificates be sent to him. The transfer agent did as directed, canceled Certificate No. 1465, issued Certificate No. 1472, for 400,000 shares, and No. 1473, for 379,620 shares, and sent them to Poyiadjis. Poyiadjis, however, lost the certificates and had to request re-issuance of each certificate. The agent re-issued once again, and Certificate No. 1483, for 400,00 [sic] shares, and No. 1484, for 379,620, were issued. Pursuant to a hand-written note from Poyiadjis dated September 25, 2000, those certificates were sent to Grut[4] in Monaco by overnight delivery.

(d) Bordier received the shares on or about October 3, 20000 and deposited them into an account at Bordier which was held in the Onyx name and had been opened by Grut on September 28, 2000. Bordier immediately sent the shares to BBH[5] for sale, and BBH received the shares on October 4, 2000. . . .

(e) BBH then sold the 400,000 shares in 11 separate blocks beginning on October 9, 2000 and ending on November 2, 2000, with total proceeds exceeding $14 million. After transfers were made into the Bordier Onyx account from some of the other 14 Swiss accounts controlled by Meyer, Grut and Baines,[6] all of which were derived almost exclusively from the sale of AremisSoft stock, funds were transferred out of the Bordier Onyx account to the UBS Oracle account and the Hentsch Oracle account on March 7, 2001. From those two accounts, as discussed below, fund transfers were made into the Oracle account at Fleming in the Isle of Man on July 26, 2001.

(f) On March 7, 2001, $47,000,024.29 was transferred from the Onyx account at Bordier and received into the UBS account on March 9, 2001.

*Id.* In addition to these shares belonging to Poyiadjis, proceeds of the sale of shares belonging to Kyprianou and his exercise of AremisSoft stock options were allegedly transferred to the Oracle UBS account in

---

3. Scott Bartel was an attorney who would usually issue instructions to transfer the shares. Compl. ¶ 125.

4. Peter Grut was a trustee of trusts in the Isle of Man (one of which was the Trident Trust) that were established by Poyiadjis to hold his proceeds from the sales of AremisSoft stock. Compl. ¶ 79.

5. Brown Brothers Harriman ("BBH") would arrange to sell the shares in the open market. Compl. ¶ 127.

6. Roger Andre Meyer and John Trevor Roche Baines were trustees of the Isle of Man trusts, along with Grut. Compl. ¶ 79.

June of 2001 and later that month transferred into an account at the Bank of Cyprus. *Id.* ¶¶ 141–48.

The complaint states that by mid-May, 2001, there were "widespread media reports" about the inflated revenues reported by Kyprianou and Poyiadjis and other components of their fraudulent scheme. *Id.* ¶ 134. On May 21, 2001, an article entitled "The Plot Thickens: Bulgaria Disputes AremisSoft's Claims" reported that Bulgarian officials and the World Bank had confirmed that an AremisSoft contract to automate the nationwide healthcare system of Bulgaria was worth far less than reported. *Id.* ¶ 135; *see also id.* ¶¶ 31–53. On July 6, 2001, trustees of the Trident Trust wrote UBS to inform the bank of their decision to consolidate their banking in the Isle of Man. *Id.* ¶ 138. On July 12, 2001, $35,080,000 was transferred from the UBS account to the Isle of Man Bank, but these funds were returned from that bank on July 16, 2001, and on July 26, 2001 UBS transferred substantially the same amount to a different bank on the Isle of Man. *Id.* All of this was just weeks before NASDAQ suspended trading of AremisSoft on July 30. *Id.* ¶ 19. On August 28, 2001, the day before AremisSoft was delisted from NASDAQ, the UBS account was closed and the balance sent to an account in the Isle of Man. *Id.* ¶ 140.

The complaint contains two counts. Count I alleges that the bank aided and abetted the breach of fiduciary duty perpetrated by Kyprianou and Poyiadjis against AremisSoft. Count II is a Swiss tort claim based upon UBS's alleged violations of Swiss statutory law provisions. Specifically, Count II alleges substantive violations of three statutory provisions: (1)

the Federal Act on Prevention of Money Laundering in the Financial Sector ("Money Laundering Act"), which requires banks to verify the identity of the customer opening an account through examination of proper documentation; requires banks to identify the beneficial owner of the assets in the account if the customer is not the owner; and requires additional investigation and reporting measures where a customer engages in unusual transactions or there is reason to suspect that assets in the account are proceeds of criminal conduct, *see id.* ¶¶ 90, 93–95; (2) Article 305ter of the Swiss Federal Code of Criminal Law, which prohibits financial intermediaries from accepting, holding on deposit, investing, or transferring assets or failing to determine the identity of the beneficial owner of the assets without the necessary diligence required by circumstances, *see id.* ¶ 91; and (3) Article 305bis of the Swiss Federal Code of Criminal Law, which prohibits anyone from taking action to frustrate the discovery, tracing, or recovery of funds he or she knows or must assume are the proceeds of criminal conduct, *see id.* ¶¶ 92. It is contended that if UBS had heeded its obligations under these statutes as well as under banking requirements,[7] the Bank would have taken steps to verify the beneficial owner/s of the accounts, and the two swindlers would have been unsuccessful in their scheme. *Id.* ¶¶ 88, 89, 101. Plaintiffs allege that under Article 41 of the Swiss Code of Obligations, which provides that anyone who causes harm to another (whether willfully or negligently) shall be liable for damages, civil damages may be awarded for violations of these statutory provisions. *Id.* ¶ 162.

7. The other provisions cited are the Swiss banks' Code of Conduct with Regard to the Exercise of Due Diligence (the "Due Diligence Agreement"), *see* Compl. ¶¶ 97–100 and the Ordinance of the Federal Banking Commission Concerning the Prevention of Money Laundering ("Banking Commission Ordinance"), *see id.* ¶¶ 90, 96. Plaintiffs do not, however, seek remedy in Count II for alleged violations of these provisions.

## D. *Judge Pisano's Decision*

After defendant had filed its motion, but before the motion was fully briefed, District Judge Pisano dismissed a similar case brought by the same plaintiffs in the District of New Jersey against two private Swiss banks. *See LaSala, Zeidman v. Bordier et CIE & Dominick*, 452 F.Supp.2d 575 (D.N.J.2006). The complaint in that case had, like the complaint at bar, asserted tort and Swiss statutory claims. Judge Pisano dismissed all the claims on the ground that the entire action was preempted by SLUSA. *Id.* at 579–91.

In that case, defendants had filed a separate motion to dismiss on the basis of *forum non conveniens* and lack of personal jurisdiction, but "contend[ed] that dismissal under SLUSA ... is a subject matter jurisdiction inquiry pursuant to Rules 12(b)(1) and 12(h)(3)." 452 F.Supp.2d at 577 n. 1. While Judge Pisano noted that the case had been brought on the basis of diversity jurisdiction, he said, "The Court need not resolve whether this motion is properly brought pursuant to Rule 12(b)(1) and/or Rule 12(h)(3)," because the parties agreed that SLUSA would be addressed before other pending motions and the outcome of his SLUSA analysis rendered the other pending motions moot. *Id.*

SLUSA preemption is certainly a question of subject matter jurisdiction when the case comes to federal court via removal from a state court. *See Spielman v. Merrill Lynch et al.*, 332 F.3d 116, 122–25 (2d Cir.2003); *Araujo v. John Hancock Life Ins. Co.*, 206 F.Supp.2d 377, 380 (E.D.N.Y.2002). For claims that fall within SLUSA, the statute preempts actions removed from state courts "by essentially converting a state law claim into a federal claim," *Spielman*, 332 F.3d at 123, and then mandating its dismissal. As Judge Lynch of this Court has pointed out, however, the statute contains separate provi-

sions concerning "preemption as a jurisdictional mechanism requiring removal" and "preemption as a defense to state-law claims." *Winne v. Equitable Life Assurance Soc. of U.S*, 315 F.Supp.2d 404, 409 (S.D.N.Y.2003). Preemption therefore appears in SLUSA in the form of *both* a jurisdictional provision *and* a failure to state a claim provision. Normally, as Judge Newman pointed out in a concurring opinion in *Spielman*, the two are "the opposite sides of the same coin." *Spielman*, 332 F.3d at 132. *See also Winne*, 315 F.Supp.2d at 409. The case at bar was not *removed* from a state court to this Court. Plaintiffs *initially* filed their complaint in this Court on the basis of diversity of citizenship. In consequence, SLUSA is a preemption *defense* and, as such, one of a number of preliminary grounds for dismissal, among which a judge has discretion to choose when deciding whether to dismiss a case. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, — U.S. —, —, 127 S.Ct. 1184, 1186, 167 L.Ed.2d 15 (2007) (a federal court "has leeway to choose among threshold grounds for denying audience to a case on the merits") (citation and internal quotation marks omitted). In the exercise of that discretion, I consider first the *forum non conveniens* ground for dismissal.

## II. DISCUSSION

### A. *Forum Non Conveniens*

The doctrine of *forum non conveniens* permits a court to dismiss an action "even if the court is a permissible venue with proper jurisdiction over the claim." *Carey v. Bayerische Hypo– und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir.2004) (citation omitted). A district court should dismiss a complaint where, on balance, the resolution of the matter in an adequate alternative forum would be more convenient for the parties and courts and

more just. *See R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir.1991) ("The central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice."). "The first step in a *forum non conveniens* analysis is for the court to establish the existence of an adequate alternative forum. Second, the court must determine the level of deference to accord the plaintiff's choice of forum. Third, the court must weigh the public and private interests in order to determine which forum will be most convenient and will best serve the ends of justice." *USHA (India), Ltd. v. Honeywell Int'l Inc.*, 421 F.3d 129, 134 (2d Cir.2005) (emphasis in original) (internal question marks omitted).

A decision to dismiss "lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been *clearly abused.*" *Id.* at 134 (quotation omitted). "In the last analysis, it always must be borne in mind that there is no algorithm that assigns precise weights to the factors that inform *forum non conveniens* determinations. The doctrine instead is intensely practical and fact-bound. The most that may be said is that courts reach informed judgments after considering all of the pertinent circumstances." *First Union Nat'l Bank v. Paribas*, 135 F.Supp.2d 443, 448 (S.D.N.Y.2001), *aff'd sub nom., First Union Nat'l Bank v. Arab African Int'l Bank*, 48 Fed.Appx. 801 (2d Cir.2002) (unpublished opinion).

### 1. Adequacy of the Alternative Forum

An alternative forum is adequate "if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir.2003). The test does not require that the alternative forum provide the same degree of relief. *See Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 453 (2d Cir.1975) (district court "has discretion to dismiss an action under the doctrine of forum non conveniens, ... even though the law applicable in the alternative forum may be less favorable to the plaintiff's chance of recovery"). "Absent ... a fundamental obstacle to a plaintiff's recovery ... American courts are not prone to characterizing a sovereign nation's courts as 'clearly unsatisfactory.' International comity plays a part in this context as well." *Sussman v. Bank of Israel*, 801 F.Supp. 1068, 1076 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir.1993).

Because defendant may properly be sued in Switzerland, *see* Decl. Isabelle Romy in Supp. Def.'s Mot. Dismiss, dated June 2, 2006 ("Romy Decl."), ¶¶ 24–26, only the second part of the test is at issue. Both parties agree that Switzerland does not recognize a cause of action for aiding and abetting a breach of fiduciary duty parallel to that brought by plaintiffs, and therefore that if this case were tried in Switzerland, and Swiss law were applied, Count I will fail. *See* Def.'s Mem., at 18; Romy Decl., ¶¶ 34–36 (Swiss law recognizes aiding and abetting liability only in criminal context); Pl.'s Mem. in Opp'n, at 8. Plaintiffs contend that since Switzerland does not afford plaintiffs a cause of action comparable to Count I, and since defendant also maintains that plaintiffs have no claim under Swiss law, Switzerland is an inadequate alternative forum. *See* Pl.'s Mem. in Opp'n, at 8.

The Second Circuit, however, has made it abundantly clear that "[t]he availability of an adequate alternate forum does not depend on the existence of the identical cause of action in the other forum." *PT United Can Co. v. Crown Cork & Seal Co.*,

138 F.3d 65, 74 (2d Cir.1998). *Cf. Zweig v. Nat'l Mortgage Bank of Greece,* No. 91 Civ. 5482, 1993 WL 227663, at *9 (S.D.N.Y. June 21, 1993) (plaintiffs' contention that only one legal remedy remains in Greece due to tolling of Greek statute of limitations is incorrect and thus plaintiffs have "a number of options that remain viable" and there is no "fundamental obstacle" to plaintiffs' recovery). Courts in this district have sometimes found overseas fora inadequate where plaintiff's have sued under particular U.S. statutory regimes, *see Greenlight Capital, Inc. v. GreenLight (Switzerland) S.A.,* No. 04 Civ. 3136, 2005 WL 13682, at *5 (S.D.N.Y. Jan. 3, 2005) (inadequacy of the alternative forum stemmed from the fact that "[t]rademark rights are largely territorial, as they exist in each country solely according to that country's statutory scheme") (citation and some internal quotation marks omitted), but here plaintiffs' causes of action that will fail in Switzerland are not based on U.S. statutory law but rather on common law tort. The mere fact that Switzerland's tort law is not written to provide precisely the same causes of action as ours does not render its forum inadequate. In addition, where portions of Swiss law are designed to prevent banks from facilitating money laundering, it cannot be said that the forum fails to permit "litigation of the subject matter of the dispute." Consequently, the courts of Switzerland constitute an adequate alternative forum.

## 2. Deference Due to Plaintiffs' Choice of Forum

■ The adequacy of the alternative forum having been determined, the next question is the amount of deference to be given plaintiffs' choice of forum. In cases with foreign defendants, the home forum for the plaintiff is any federal district in the United States, not the particular district in which the plaintiff lives. *Guidi v.*

*Inter–Continental Hotels Corp.,* 224 F.3d 142, 146 (2d Cir.2000); *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG,* 160 F.Supp.2d 722, 743 (S.D.N.Y.2001). Thus in this case I must consider the deference that should be given plaintiffs' choice to sue in the United States (not New York specifically) as opposed to Switzerland.

■ In the Second Circuit, the "degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations." *Iragorri v. United Techs. Corp.,* 274 F.3d 65, 71 (2d Cir.2001) (en banc). Considerations include "the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice," which encompasses "convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district." *Id.* at 72. Plaintiffs argue that they fall at a very high point on this sliding scale. *See* Pl.'s Mem. in Opp'n, at 6. Plaintiffs do have significant ties to the United States, as this is where AremisSoft was incorporated, where the bankruptcy Trust was established, and where the vast majority of the beneficiaries of the Trust are located. I agree that plaintiffs have legitimate reasons for preferring to prosecute this action in the United States, such as convenience and expense and their interest in having an American judge decide issues that they maintain arise under American law. While a court will accord "diminishing deference to a plaintiff's forum choice to the extent that it was motivated by tactical advantage," *Iragorri,* 274 F.3d at 73, I do not find tactical motivation of the kind that would diminish the deference owed them for that reason.

■ However, in the Second Circuit, that deference *is* diminished when "plain-

tiff is a corporation doing business abroad and can expect to litigate in foreign courts." *Guidi,* 224 F.3d at 147. *See Morrison Law Firm v. Clarion Co., Ltd.,* 158 F.R.D. 285, 287 (S.D.N.Y.1994) ("The private interest of plaintiffs in suing in its [sic] home location is diluted because it chose to do business with Japanese firms and to seek their custom, making it logical that they be required to litigate there, a result which should not expose plaintiff to surprise."); *CCS Int'l, Ltd. v. ECI Telesystems, Ltd.,* No. 97 Civ. 4646, 1998 WL 512951, at *7 (S.D.N.Y. Aug. 18, 1998) (while "it remains defendants' burden to overcome the forum choice made by these American-citizen plaintiffs," for plaintiffs "who are involved in a decidedly international dispute such as this, their American citizenship and residence do not constitute the powerful, near-decisive factors for which they contend") (citation and internal quotation marks omitted); *Sussman,* 801 F.Supp. at 1073 ("Where an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against forum non conveniens dismissal is diminished."). A plaintiff's choice of forum is also "given reduced emphasis where ... the operative facts upon which the litigation is brought bear little material connection to the chosen forum." *Nieves v. Am. Airlines,* 700 F.Supp. 769, 772 (S.D.N.Y.1988). *See also Zweig,* 1993 WL 227663, at *4 (notwithstanding plaintiff's American citizenship and residency, dismissal in favor of Greece is warranted because operative facts on which the litigation was based bore little connection to New York).

Plaintiffs are not a corporation doing business abroad, but they are suing on behalf of a Trust whose governing document specifically authorizes litigation abroad. Plaintiffs have already litigated abroad in the Isle of Man and Cyprus. Compl. ¶¶ 80, 82. Plaintiffs therefore more closely resemble a corporation with substantial resources than ordinary citizens of comparatively modest means. *See Carey,* 370 F.3d at 238 (in the case of an "individual of modest means," this "individual's choice of the home forum may receive greater deference than the similar choice made by a large organization which can easily handle the difficulties of engaging in litigation abroad"). Moreover, the operative facts of this litigation unquestionably took place in Switzerland. *See infra* Part II.A.3.b. I therefore conclude that while plaintiffs' choice of forum is entitled to some deference, it does not operate at full strength.

■ Additionally, I note that "[a] citizen's forum choice should not be given dispositive weight.... [D]ismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 256 n. 23, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (citations omitted). *See also Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 102 (2d Cir.2000) (There is no "rigid rule of decision protecting U.S. citizen or resident plaintiffs from dismissal for *forum non conveniens*"; rather, a court "must take into account the hardship dismissal would cause to a resident plaintiff"); *Paribas,* 135 F.Supp.2d at 447 ("[T]he weaker the connection between a plaintiff's U.S. activities, even those of a U.S. plaintiff, and the events at issue in the lawsuit, the more likely it is that defendants attacking the plaintiff's choice of a U.S. forum will be able to marshal a successful challenge to that choice.").

Courts in this Circuit have numerous times dismissed suits by an American citizen or entity in favor of a foreign jurisdiction. *See, e.g., Alcoa Steamship Co., Inc. v. M/V Nordic Regent,* 654 F.2d 147 (2d Cir.1980) (en banc) (in suit by American corporation, Trinidad held to be more appropriate forum); *Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880 (2d Cir.1978) (dismissing suit by Iranian national on the basis *of forum non conveniens* despite treaty that mandated court access equivalent to American citizen); *Telephone Sys. Int'l, Inc. v. Network Telecom PLC,* 303 F.Supp.2d 377, 384–85 (S.D.N.Y.2003) (dismissing in favor of United Kingdom despite presumption in favor of American corporation's choice of United States forum because "[t]hat presumption in favor of a plaintiff's convenience is not absolute and may be outweighed"); *Realuyo v. Villa Abrille,* No. 01 Civ. 10158, 2003 WL 21537754, at *4 (S.D.N.Y. Jul. 8, 2003) (finding, in concluding that the Philippines would be more appropriate jurisdiction, that "[a]lthough [American plaintiff's] forum choice warrants great deference, it is in this case outweighed by every other consideration"); *Paribas,* 135 F.Supp.2d at 447; *Panama Processes S.A. v. Cities Serv. Co.,* 500 F.Supp. 787, 792 (S.D.N.Y. 1980) (American citizenship has "no particular effect" where other factors favor dismissal), *aff'd,* 650 F.2d 408 (2d Cir.1981).

In this case, because plaintiffs are not an entity that stands to experience hardship of the kind that would be suffered by an individual plaintiff of modest means, I conclude that the deference due to plaintiffs is not so significant as to outweigh other factors if they weigh in favor of defendant.

### 3. Private and Public Interests

 In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), the Supreme Court set forth private and public interest factors to be considered by the district court in determining which forum is most convenient and will best serve the ends of justice. These include "the ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. Public interest factors include administrative difficulties stemming from court congestion, the interest in having "localized controversies decided at home," and the interest in having issues of foreign law decided by a foreign tribunal. *Id.* at 508–09, 67 S.Ct. 839.

### a. Private Interest Factors

 Where alleged misconduct is centered in the foreign forum and the majority of evidence resides there, dismissal is favored. *See Strategic Value Master Fund v. Cargill Fin. Servs. Corp.,* 421 F.Supp.2d 741, 766 (S.D.N.Y.2006) (granting motion to dismiss in favor of England). *See also Acosta v. JPMorgan Chase,* 06 Civ. 995, 2007 WL 689529, at *2 (2d Cir. Mar. 6, 2007) (nothing unreasonable in district court's conclusion that inconvenience of transporting witnesses and translating documents from Spanish to English favors dismissal) (unpublished opinion); *Carey,* 370 F.3d at 238–39 (district court's decision to dismiss in favor of Germany was proper due to difficulty otherwise to be incurred by German defendant in securing presence of its witnesses in the United States and due to reasonableness of requiring plaintiff to litigate business transaction dispute in the country where it occurred); *Zweig,* 1993 WL 227663, at *7 (Greece more appropriate forum where "majority of the witnesses and documentary evidence" is located there).

In this case, the vast majority of evidence appears to be in Switzerland, where the Bank account was opened and administered. Documentary evidence includes documentation related to the account and transactions concerning it, and according to defendant these are in the possession of UBS in Switzerland. Def.'s Mem., at 10. Plaintiffs, by contrast, maintain that the United States houses important documents because each transfer of dollars from the UBS's account had a corresponding transaction in the United States at a New York "money center" bank and because documentary evidence related to the AremisSoft fraud has been accumulated by the Trust and by the United States government in the United States. Pl.'s Mem. in Opp'n, at 9–10.

Documentary evidence of the AremisSoft fraud in general does not appear to be pertinent to the actions of UBS employees, which are what is at issue in this case. Even if documentation in the United States concerning corresponding dollar transfers were relevant, I do not see how this would be more helpful than documentation of the actual transfers made through the UBS account in Switzerland. Moreover, it has not been asserted that the money center documents would include documentation concerning the opening and administration of the account, as opposed to merely the transfers made into and out of it. The documentary evidence cited by defendant to be residing in Switzerland therefore appears to be the more relevant, and thus the location of these documents weighs in favor of Switzerland. However, in an age of electronic communication, where files are usually kept in digital form, this factor does not carry great weight. *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London et al.*, 940 F.Supp. 528, 537–38 (S.D.N.Y.1996), *aff'd* 147 F.3d 118 (2d Cir.1998) ("[I]n light of technological advances in transportation and communication, this Court recognizes that the location of documents is a factor which is to be given less weight now. . . .").

The location of witnesses is a factor in the private interests analysis carrying greater weight. Plaintiffs state that Poyiadjis, who is in the custody and control of the United States Department of Justice, would be "the single most important witness in this matter," because he orchestrated the AremisSoft fraud, authorized and participated in the opening of the UBS account in question, and authorized "all of the questionable transactions at issue here or directed others to do so." Pl.'s Mem. in Opp'n, at 9–10, 10 n. 11. Plaintiffs also vaguely state that "[a]s referenced in the Complaint, significant evidence and witnesses are either in New York, New Jersey, or Connecticut." *Id.* at 9. Defendant counters that Poyiadjis might exercise his Fifth Amendment right not to testify against himself, and that if he does give testimony, it can be obtained pursuant to his cooperation with plaintiffs or pursuant to 28 U.S.C. § 1782. Def.'s Reply Mem., at 5 n. 7. Defendant, for its part, offers up two witnesses who reside in Switzerland as critical witnesses: Roger Meyer, a money manager and investment advisor for the Poyiadjis family who gave instructions for the execution of AremisSoft securities transactions at UBS and other banks, *see* Compl. ¶ 86, and was responsible for contact with UBS; and Gerald Beck, the "only UBS representative mentioned in the Complaint." Def.'s Mem., at 9 (citing Compl. ¶¶ 86, 102–05, 110–11, 120); Def.'s Reply Mem., at 4–5.

Apart from Poyiadjis, I do not know what "significant witnesses" located in the United States plaintiffs have in mind, but even those who undoubtedly would have something to say about the overall scheme perpetrated by Poyiadjis and Kyprianou will not assist a fact-finder in determining

what Bank employees knew and did surrounding the particular account at issue in this case. As Judge Weinfeld noted in a situation where an alleged fraudulent scheme occurred in Switzerland but the defendant contended that New York witnesses were important, "The New York witnesses can testify only as to how undisputed trades were executed. These matters, if pertinent at all, are not even of secondary significance; they are subordinate to the basic issue central to plaintiff's claims.... [The alleged fraudulent scheme] occurred in Geneva at Banque and Advicorp. Those who performed the fraudulent acts and issued directions in furtherance thereof did so there." *Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 511 (S.D.N.Y.1982). I am persuaded that the witnesses identified by defendant have the more relevant knowledge of the facts of this case.

Plaintiffs next argue that defendant can cause its employees to appear in the United States to testify and that to the extent that non-party witnesses reside abroad, the Hague Evidence Convention is an adequate means to compel documents and witness testimony.[8] *See* Romy Decl. ¶¶ 27–33; Pl.'s Mem. in Opp'n, at 10 n. 11. Defendant disagrees, citing Swiss experts for the proposition that a Geneva court receiving a request under the Hague Evidence Convention cannot compel bankers and other holders of professional secrecy to testify due to a complex banking secrecy regime. *See* Def.'s Reply Mem. at 5 (citing Reply Decl. Isabelle Romy, dated Aug. 24, 2006 ("Romy Reply Decl."), ¶¶ 8–10; Decl. Maurice Harari in Opp'n to Mot. Dismiss, dated Jul. 26, 2006 ("Harari Decl."), at 23–25). According to defen-

dant, Meyer's testimony may only be compelled in Switzerland under Swiss law.

In response to plaintiffs' argument, I note first that this private interest factor is about convenience to the parties; thus the presence of the vast majority of witnesses in one forum weighs in favor of that forum, even if the witnesses could be transported. *See Europe & Overseas Commodity Traders*, 940 F.Supp. at 538 (where nearly all witnesses reside overseas, "transporting witnesses from England to the United States—even if they were within this Court's subpoena power or would appear voluntarily—would be extremely inconvenient and would impose a prohibitive cost on defendants"); *Scottish Air Int'l Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232–33 (2d Cir.1996) (affirming district court's dismissal on *forum non conveniens ground* and noting that since vast majority of potential witnesses were residents of Great Britain, "the difficulty, cost, and disruption of requiring the attendance of such witnesses in New York—whether they were willing to appear or not—would be considerable" and this weighed in favor of dismissal). In addition, even assuming that evidence could be obtained by means of the Hague Convention for those who could not be compelled to testify in the United States, this method is a poor substitute for live trial testimony. *See Scottish Air*, 81 F.3d at 1233 (noting that in prior case, the Second Circuit established that "the live testimony of key witnesses was necessary where the plaintiffs alleged that the defendants had conspired to defraud them. We deemed such testimony necessary for the jury to assess the witnesses' credibility."); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir.1993) (affirming *forum non conve-*

---

8. Hague Convention on the Taking of Evidence in Civil or Commercial Matters, *opened for signature*, Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, 8 I.L.M. 37 (1969); 28 U.S.C.A. § 1781.

*niens* dismissal of securities fraud action in favor of Australia where plaintiffs alleged fraud and noting that "live testimony of key witnesses is necessary" in such cases); *Schertenleib v. Traum,* 589 F.2d 1156, 1165 (2d Cir.1978) (for important non-party Swiss witnesses, obtaining testimony by means of letters rogatory would be "very serious handicap" favoring dismissal on the ground of *forum non conveniens* ); *Paribas,* 135 F.Supp.2d at 450 (there exists a "strong preference for live trial testimony"). As two witnesses residing in Switzerland—Meyer and Beck—are likely to be key witnesses, this additionally weighs in favor of the Swiss forum.

Another consideration pertaining to the witnesses and documents is translation. Defendant notes that pertinent documents are likely to be written in French, Italian, or German, and many witnesses are likely to be native speakers of those languages. *See* Def.'s Mem., at 9, 10. This also weighs in favor of dismissal. *See Schertenleib,* 589 F.2d at 1165 ("serious problem of translation" of live testimony and documents in Switzerland is factor supporting dismissal); *Fustok v. Banque Populaire Suisse,* 546 F.Supp. 506, 510 (S.D.N.Y. 1982) ("In addition to the expense and inconvenience of travel for these [foreign August 13, 2007] witnesses, if that were contemplated, many of them do not speak English as a primary language which would present an added obstacle to a smooth flowing trial in this District."). Even putting aside the question of cost, the difficulties presented to a court's assessment of witness credibility are considerable. *See Fustok,* 546 F.Supp. at 510 ("In addition to the expense and inconvenience of travel for these [foreign] witnesses, if that were contemplated, many of them do not speak English as a primary language which would present an added obstacle to a smooth flowing trial in this District."). *See also Zweig,* 1993 WL 227663, at *8 (amount of translation of documents and testimony that would be required if litigation remained in New York far outweighs amount if action were litigated in Greece).

In sum, I am not persuaded that evidence from the U.S. sources proffered by plaintiffs would be more relevant than evidence originating from the locale of the complained-of conduct. Based on the location of documents and relevant witnesses, I conclude that the private interest factors favor defendant.

### b. Public Interest Factors

Public interest factors include judicial economy, the interest in having "localized controversies decided at home," and the interest in having issues of foreign law decided by a foreign tribunal. *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839. This Court has explained, "[T]here is little sense to allowing a U.S. citizen to haul a group of foreign defendants into a U.S. court on transactions having little or nothing to do with this country where there is an available foreign forum significantly better suited to handling the litigation in a prompt, efficient and effective manner." *Paribas,* 135 F.Supp.2d at 448 (dismissing fraud claims against French bank in favor of London, where fraudulent activity was centered). *See also Zweig,* 1993 WL 227663, at *4 (dismissing claims of New York plaintiff against Greek bank, even though plaintiff alleged he was defrauded in New York, because actions by Greek bank took place in Greece).

I turn first to the public interest in having localized controversies decided at home. This requires an evaluation of which forum possesses a stronger local interest in the controversy. *See Pollux Holding,* 329 F.3d at 76 (affirming district court's determination that London has a

"stronger local interest" in the controversy because, *inter alia*, the derivative instrument at issue was purchased there, the alleged fraud and misrepresentations primarily occurred there, and the alleged breach of contract and breach of fiduciary duty arose out of contracts entered into there). Plaintiffs state that the United States has an interest in this matter because defendant has a major presence in New York, plaintiff's are trustees of a bankruptcy trust formed there, AremisSoft was an American corporation, related civil and criminal actions are pending in this district, and the transactions at issue passed through New York money center banks. Pl.'s Mem. in Opp'n, at 11. Defendant, by contrast, maintains that Switzerland possesses an interest in adjudicating matters concerning conduct by a bank in Switzerland. *See* Def.'s Mem., at 12. Defendant also stresses Switzerland's interest in applying its own law, particularly where that law is disputed. Def.'s Reply Mem., at 3.

I am persuaded that Switzerland possesses the strongest interest in this case. The United States may have some interest in ensuring that American currency not be laundered, but the argument that dollar transfers through banks in the United States creates a strong public interest in favor of the Untied States has been rejected by courts in this Circuit. *See, e.g., Lan Assocs. XVIII v. Bank of Nova Scotia,* No 96 Civ. 1022, 1997 WL 458753, at *6 (S.D.N.Y. Aug. 11, 1997) (alleged wire transfer of funds in New York is insufficient to create public interest link to New York) ("Were such minimal contact with New York to be deemed significant, this Court, located in one of the world's largest and busiest financial centers, would be burdened with countless international financial disputes having no real, substantive link to New York."); *see also Calgarth Invs. Ltd v. Bank Saderat Iran,* No 95

Civ. 5332, 1996 WL 204470, at *6 (S.D.N.Y. Apr. 26, 1996) ("[D]ebits and credits at New York bank accounts, without more, do not give New York or the United States an interest in transactions that otherwise are entirely foreign."), *aff'd,* 108 F.3d 329 (2d Cir.1997) (mem.); *Sussman,* 801 F.Supp. at 1074 (bank's "use of its New York Branch . . . to route the loan proceeds . . . cannot be regarded, in the overall scheme of things, as other than peripheral," and this is true "even if this routing of the funds was for the purpose of evading Israeli law"). In this case, there is even less connection between the underlying events and the United States than in *Zweig.* As for plaintiffs' argument that adjudicating the interests of its residents is a United States interest, I agree that this interest exists, but it stands in equipoise to Switzerland's interest in adjudicating matters affecting its residents.

Whatever interest the United States has, it pales in comparison with that of Switzerland. Switzerland possesses a strong interest in regulating the conduct of banks within its borders. *See Zweig,* 1993 WL 227663, at *10 (despite the fact that plaintiff was allegedly defrauded in New York and made visit to branch of Greek bank in New York, quoting *Sussman* for the proposition that "Greece's public interest in the issues raised by these charges dwarfs the public interest of New York, which is minimal"). There is no question that this dispute centers around events occurring there. The Bank account was opened in Switzerland, and the transfers alleged to have been improperly permitted by the Bank were authorized by personnel there. This is at its heart a dispute involving what Swiss banking representatives did and what they knew when they did these things. The knowledge plaintiffs allege on the part of the Bank, both concerning its legal obligations and concerning the

transfers themselves, resides in the minds of Bank representatives in Switzerland. If, to quote *Gilbert*, it is preferable that "localized controversies" be "decided at home," Switzerland is home for the controversies generated by the plaintiffs' complaint.

The prevalence of foreign law in the complaint is also a factor in *forum non conveniens* analysis. This implicates both the local interests possessed by the competing jurisdictions and the *Gilbert* Court's assessment that it is more appropriate to try a diversity case "in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Gilbert*, 330 U.S. at 509, 67 S.Ct. 839. Courts often do not decide choice of law issues when performing a *forum non conveniens* analysis, *see Piper Aircraft*, 454 U.S. at 251, 102 S.Ct. 252 (judges considering *forum non conveniens* motions need not conduct an elaborate choice-of-law analysis because the doctrine "is designed in part to help courts avoid conducting complex exercises in comparative law"), but sometimes they do undertake the analysis, *see Zweig*, 1993 WL 227663, at *9 (need to engage in choice of law analysis, in which Greek law is found to apply, "plays an important role" in decision

to dismiss under *forum non conveniens* ). Not only does the application of foreign law weigh in favor of dismissal, but so does even the likelihood of its application. *See Pollux Holding*, 329 F.3d at 76 (affirming as a proper exercise of discretion district court's determination that application of English law favored adjudication in England); *Calavo Growers v. Generali Belgium*, 632 F.2d 963, 967 (2d Cir.1980) ("[T]he likelihood that Belgian law would govern in turn lends weight to the conclusion that the suit should be prosecuted in that jurisdiction."); *Paribas*, 135 F.Supp.2d at 453 (likelihood that court would have to apply English law to part or entirety of case "cuts to some degree in defendants' favor"). Since a federal court sitting in diversity applies the choice of law rules of the forum state, *see Klaxon v. Stentor Elec. Mfg.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), which in this case is New York, if New York choice of law rules dictate that this case arises entirely under Swiss law, that outcome weighs in favor of dismissal.

In tort cases, New York courts apply the law of the jurisdiction with the "greatest interest" in regulating behavior within its borders or in having its law applied.[9] *Brink's Ltd. v. South African*

**9.** As noted in text, Count I of the complaint charges UBS with aiding and abetting breaches by Kyprianou and Poyiadjis of fiduciary duties they owed to AremisSoft. Plaintiffs claim that Count I arises under Delaware law, *see* Pl.'s Mem. in Opp'n, at 12, which is where AremisSoft was incorporated. Several courts in this district have applied to aiding and abetting claims a doctrine known as the "internal affairs doctrine," which calls for the law of the state of incorporation to be applied to issues relating to the internal affairs of a corporation. *See Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 04 Civ.A. 2476, 2006 WL 278138, at *12 (S.D.N.Y. Feb. 2, 2006) (Batts, J.); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 80

F.Supp.2d 129, 134 (S.D.N.Y.1999) (Cedarbaum, J.); *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F.Supp.2d 123, 129 (S.D.N.Y.1999) (Cedarbaum, J.); *Lou v. Belzberg*, 728 F.Supp. 1010, 1023 (S.D.N.Y.1990) (Sweet, J.). This doctrine might seem to call for U.S. state law to be applied as AremisSoft was incorporated here. However, both Judges Cedarbaum and Sweet recognized that the "internal affairs doctrine" merely amounts to an assessment "that the state of incorporation has an interest superior to that of other states in regulating the directors' conduct of the internal affairs of its own corporations." *Raccolta*, 60 F.Supp.2d at 129. In *Raccolta*, Judge Cedarbaum essentially determined that the state

*Airways,* 93 F.3d 1022, 1031 (2d Cir.1996) (citing cases). This is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Fin. One Public Co. Ltd. v. Lehman Bro. Spec. Fin., Inc.,* 414 F.3d 325, 337 (2d Cir.2005) (citation and internal quotation marks omitted). "The contacts of the parties and occurrences with each jurisdiction are thus factors to be considered in applying interest analysis, together with the policies underlying each jurisdiction's rules, the strength of the governmental interests embodied in these policies, and the extent to which these interests are implicated by the contacts." *Id.*[10]

■■■ In applying interest analysis, New York courts have said that "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Machinery,* 81 N.Y.2d 66, 72, 595

N.Y.S.2d 919, 612 N.E.2d 277 (N.Y.1993). The locus of the tort is where the "last event necessary to make the actor liable occurred." *Simon v. Philip Morris Inc.,* 124 F.Supp.2d 46, 58 (E.D.N.Y.2000) (citation omitted). However, this "last place" criterion "is not chiseled in stone, but rather gives way when it is at war with state interests so that the more general *Babcock* principle applies." *Id.* (referring to the landmark interest analysis case *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963)). In other words, this "last place" criterion does not displace ordinary interest analysis. *See Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452, 492 (S.D.N.Y.2001) (refusing to apply the last event necessary test where a single state was overwhelmingly the center of gravity of the events at issue and that state's interest in regulating the conduct of work performed there was strong); *HSA Residential Mortgage Servs. of Texas v. Casuccio,* 350 F.Supp.2d 352, 365 (E.D.N.Y.2003) (refusing to apply "last place" criterion in case where plaintiffs alleged that defendant accounting firms prepared and approved fraudulent financial statements and

---

of incorporation *was* the jurisdiction with the greatest interest for the aiding and abetting claim. Applying these same principles, Judge Mukasey found that a claim for aiding and abetting a breach of fiduciary duty should simply be analyzed under normal "interest analysis." *See Solow v. Stone,* 994 F.Supp. 173, 177 (S.D.N.Y.1998), *aff'd,* 163 F.3d 151 (2d Cir.1998) ("[T]here is no jurisdiction with an interest greater than New York's with respect to these [aiding and abetting] tort claims."). He concluded that while the jurisdiction of incorporation is usually appropriate for claims against directors for breaching a fiduciary duty, it is not appropriate for aiding and abetting claims. *Id. See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 17 F.Supp.2d 275, 306 n. 16 (S.D.N.Y.1998) (agreeing with *Solow v. Stone* court that aiding and abetting breach of fiduciary claim is governed by law of place where the acts giving rise to the claim took place). Thus, normal interest analysis is appropriate even for plaintiffs' aid-

ing and abetting claim. *See also In re Adelphia Commc'n Corp.,* 365 B.R. 24, 40–41 (Bkrtcy.S.D.N.Y.2007) (analyzing two lines of cases, one applying the "internal affairs" doctrine and the other applying normal interest analysis, and concluding that "the Court believes it should follow the latter line of authority.").

**10.** The "place of the wrong" was the jurisdiction applied in tort cases under the old New York choice of law rules, but it was replaced with the more flexible "interest analysis." *See Brink's,* 93 F.3d at 1030 (in discussing New York's shift to the interest analysis approach, "New York courts, recognizing that a State may lack sufficient nexus with a case so that choice of its law is arbitrary or fundamentally unfair, abandoned these rigid rules in favor of a more flexible approach") (internal quotation marks and citation omitted).

instead applying law of New York which "has a strong interest in defining the scope of liability for accountants who work in its state" and "has the more significant interest in having its conduct-regulating law govern in order to regulate behavior within its borders"). Even the Second Circuit's recent application of the test did not rely on it exclusively in conducting interest analysis. *See White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir.2006) ("[H]ere, where *not only* the vast majority of the conduct supporting the claim occurred in New York, *but also* the damages were suffered at WPL's New York headquarters, New York has the most significant interest and its laws apply.") (emphases added).

In this case, the "last place" or locus of the "last event necessary" is the United States, where the harm allegedly caused by the Bank was felt. A situation such as this, where the alleged misconduct occurred in one jurisdiction, but because of the international nature of a company's business dealings the harm caused by that misconduct was felt in another country, presents precisely the sort of circumstance where a blind adherence to the rule that the last place determines the locus of the tort and therefore the jurisdiction with the greatest interest would result in the jurisdiction which does not possess the greatest interest being deemed so for choice of law purposes. In *Sussman* I held that even where the injury was felt in the United States, "Whether or not defendants' conduct was tortious will be measured by the law of Israel. It is that law upon which the parties, plaintiffs and defendants alike, relied in respect of defendants' conduct; and the interest of Israel in applying its law to admonish or prevent similar conduct in the future assumes a critical, and in my opinion, controlling importance in choice of law analysis." *Sussman*, 801 F.Supp. at 1075 (citing cases to support proposition

that "this Court has regarded the place where the victim of fraud or negligence suffered economic loss as less significant for choice of law purposes than the law of the place by which the defendant's conduct is evaluated"). *See also Pollux Holding*, 329 F.3d at 76 (approving district court's assessment that "[g]iven that most of the relevant conduct occurred in England, English law would apply to the preponderance of plaintiffs' tort claims"); *Granite Partners*, 17 F.Supp.2d at 306 n. 16 (applying law of jurisdiction where acts giving rise to aiding and abetting breach of fiduciary duty claim took place); *Brink's*, 93 F.3d at 1032 (where injury of theft was felt in the United States, South Africa has greater interest than New York in the alleged wilful misconduct or gross negligence of South African Airways, a government instrumentality, and the South African police).

In this case, as discussed *supra*, the contacts between Switzerland and the underlying events are strong, while the contacts with the United States are minimal. *See Finance One*, 414 F.3d at 337 (contacts between Thailand and events are strong but between New York and events are weak where negotiations and other activities surrounding transactions at issue took place in Thailand, Hong Kong, or Tokyo). I conclude that the strength of Switzerland's interest in the litigation outweighs that of the United States. Switzerland's interest in regulating the conduct of banks within its borders, particularly where the bank is a leading financial services provider in the country, is great. The reputability of the country's banking system is intimately connected to the effectiveness of the country's regulation of its banks, and Switzerland has a stronger interest in policing its financial systems than does the United States in ensuring that United States dollars are not laun-

dered abroad to the detriment of United States shareholders and a United States company. Because the operative events took place almost exclusively in Switzerland, the contacts with Switzerland directly implicate these significant governmental interests. I therefore conclude that Swiss law applies to Count I of the complaint.

Not only does choice of law analysis indicate that Switzerland's interest in the case is greater than that of the United States, but Switzerland's interest in this litigation is all the more keen as the parties dispute the application of Swiss law to plaintiffs' claims. Defendant submits a declaration by Isabelle Romy, a Swiss lawyer, professor, and a Deputy Justice of the Swiss Supreme Court, to support its contention that certain Swiss law provisions invoked by plaintiffs do not protect any private person's financial interests. Romy Decl. ¶¶ 50, 55, 57. Plaintiffs submit a declaration by Maurice Harari, a Swiss lawyer, former prosecutor, lecturer, and judge, that offers a competing interpretation of the relevant Swiss law. *See* Harari Decl. ¶¶ 1–11. The two experts, for instance, disagree on whether a violation of the criminal money laundering statute, Art. 305bis, can form the basis for a tort claim under Art. 41 CO. As Ms. Romy characterizes their disagreement, "Mr. Harari disputes my conclusion that this is an open question of Swiss law maintaining that the matter is settled. In my opinion, Mr. Harari overstates the significance of recent decisions." Romy Reply Decl. ¶ 16 (citation omitted).

Despite these differences, the two experts agree in the most crucial respect: that portions of Swiss law that would be applied to this case are unresolved. *See* Romy Decl. ¶ 57 (whether Art. 305bis may form the basis of a tort claim is an issue that "has not been conclusively determined by the appropriate chamber of the Swiss Supreme Court"); Harari Decl. ¶ 46 ("In my opinion, it is not possible to assert categorically that a violation of Art. 305 SPC cannot imply a liability of a bank under Art. 41 CO, as the Swiss Supreme Court has not reached a decision on this question."); Harari Decl. ¶ 47 ("[A]lthough several authors have expressed the opinion that the [Money Laundering Act] aims at the protection of the integrity of the Swiss financial system, no decision of the Swiss Supreme Court has, up to now, expressly denied liability under art. 41 CO, for an unlawful act constituting a violation of the provisions of the MLA.").

It is inadvisable for this Court to decide a case where legal experts disagree about critical points in the application of the foreign law. *See Schertenleib*, 589 F.2d at 1165 ("Swiss law appears to apply to the tort claims. This necessitates the introduction of inevitably conflicting expert evidence on numerous questions of Swiss law, and it creates the uncertain and time-consuming task of resolving such questions by an American judge unversed in civil law tradition."); *Acosta v. JPMorgan Chase*, 05 Civ. 997, 2006 WL 229196, at *8 (S.D.N.Y. Jan. 30, 2006) ("[T]his case will require extensive applications of both Uruguayan and Argentine law.... Both parties have submitted affidavits with conflicting interpretations of the relevant Uruguayan and Argentine laws, and we do not doubt that it would be necessary to 'untangle' these problems if the case proceeded here."), *aff'd* 2007 WL 689529 (2d Cir. Mar. 6, 2007); *Fustok*, 546 F.Supp. at 513 ("With Swiss legal experts in such sharp dispute as to Swiss law and the holding of Swiss high court rulings, the matter is best left to knowledgeable Swiss jurists."); *Panama Processes*, 500 F.Supp. at 798 (possibility of having to "parse significant substantive and procedural questions of [foreign] law" weighs in favor of dismissal). It is even more inadvisable for

this Court to decide issues of Swiss law that both experts *agree* are unsettled. My deciding a complex and unsettled issue of Swiss law is a powerful factor weighing in favor of dismissal. I therefore conclude that the public interest strongly favors Switzerland.

Because the private interest factors also favor Switzerland, and it is an adequate alternative forum, I hold that the measure of deference due to plaintiffs' choice of forum is outweighed, and dismissal on the ground of *forum non conveniens* is warranted.

## B. *SLUSA Preemption*

Although the complaint will be dismissed on the basis of *forum non conveniens,* I will discuss the other grounds for dismissal urged by the Bank in this motion, so that the Court of Appeals will be aware of this Court's opinion on all issues if it decides to reverse the *forum non conveniens* dismissal. I begin with SLUSA preemption.

In 1995 Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which imposed constraints on federal securities class actions due to "perceived abuses of the class-action vehicle in litigation involving nationally traded securities." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 126 S.Ct. 1503, 1510, 164 L.Ed.2d 179 (2006) ("*Dabit II*"), *rev'g Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25 (2d Cir.2005) ("*Dabit I*"). Litigants, however, began to avoid application of the PSLRA by bringing class actions based on state law in state court, and Congress enacted SLUSA to prevent such circumvention. *See Dabit II,* 126 S.Ct. at 1510–12. To dismiss an action under SLUSA, the defendant must show: (1) the action is a "covered class action" under SLUSA; (2) the action is based on state law; and (3)

the action is one in which the party alleges "an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security" or alleges that "the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C.A. § 77p(b). *See Webster v. N.Y. Life Ins. & Annuity Corp.,* 386 F.Supp.2d 438, 440 (S.D.N.Y.2005).

For the following reasons, I conclude that even though plaintiffs' claims would constitute a covered class action arising under state law, they would not fall within SLUSA's substantive preemption.

### 1. Covered Class Action

A "covered class action," as defined by SLUSA, includes a lawsuit in which "damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class ... predominate over any questions affecting only individual persons or members." 15 U.S.C. § 77p(f)(2)(A). The statute also states that "[f]or purposes of this paragraph, a corporation, investment company, pension plan, partnership, or other entity, shall be treated as one person or prospective class member, but only if the entity is *not established for the purpose of participating in the action.*" 15 U.S.C. § 77p(f)(2)(C) (emphasis added). Thus, if damages are sought on behalf of an entity (perhaps in addition to other persons), and the entity itself benefits multiple persons, that entity will nonetheless be treated as one person if it was not established for the purpose of participating in the action. In other words, the beneficiaries of damages that would accrue to an entity will only be counted towards the 50–person limit under circumstances where the entity was established to participate in the action.

In the case at bar, an action is brought by the Trustees on behalf a Trust that was assigned both the claims of former shareholders and the claims of AremisSoft itself. These threshold questions arise: (1) whether the Trust is seeking damages "on behalf of" more than 50 persons; and (2) if it is, whether the Trust falls within the entity exception, thereby avoiding a class action designation for what would otherwise be the claims of more than 50 persons. Defendant maintains that the Trust was formed for the purpose of participating in the action, as is evidenced by the Trust Agreement, and therefore is not to be counted as a single entity. *See* Def.'s Mem., at 13. Plaintiffs counter that the Trust was formed for multiple purposes associated with its origin in a bankruptcy proceeding, only one of which is litigating Trust claims, and that therefore it does not constitute a covered class action. *See* Pl.'s Mem. in Opp'n, at 21.

Do these plaintiffs seek damages "on behalf of more than 50 persons," as that phrase is used in SLUSA? Because plaintiffs assert that they are bringing claims only on behalf of the Company, *see* Pl.'s Mem. in Opp'n, at 21 ("Here, the only claims asserted are the claims of the corporate debtor AremisSoft. No claims of the shareholder class are asserted."),[11] and a district court in Massachusetts distinguished corporate claims brought by a bankruptcy trust from the shareholder claims brought by the trust, *see Cape Ann*

*Investors LLC v. Lepone*, 296 F.Supp.2d 4, 12–13 (D.Mass.2003), I first assess the significance of bringing "company claims" to the application of SLUSA's definition of a "covered class action." This is a straightforward analysis. The statutory definition speaks not in terms of the types of claims asserted but only whether damages are asserted "on behalf of" more than 50 persons. Here, plaintiffs' complaint states that the action is brought "for the benefit of the victim-beneficiaries of the Aremis-Soft Trust," Compl. ¶ 1, and that "[t]he beneficiaries of the AremisSoft Trust, who number over 6,000 persons and entities all across the globe, including in Cyprus, are entitled under the Plan to recover 100% of these damages, plus interest, net of all costs of recovery, including legal fees, and other administrative expenses." *Id.* ¶ 78. The complaint also states that

> any and all claims arising out of the purchase of AremisSoft securities on the open market or otherwise from April 22, 1999 through and including July 27, 2001, and any and all of AremisSoft's claims, were assigned to, and for the benefit of, the AremisSoft Trust. Through the Co–Trustees, the Aremis-Soft Trust serves as the vehicle for the prosecution of all such claims. Accordingly, under the Plan, the co-Trustees, as Plaintiffs, now bring this action against the Defendant on behalf of the AremisSoft Trust.

*Id.* ¶ 8. *See also* Trust Agreement,[12] Art. III, §§ 3.3(a)-(b) (stating that Trust recov-

---

11. Plaintiffs' complaint appears to assert both the claims of investors ("investor claims") and the claims of the Company ("company claims"). *See* Compl. ¶ 1 (action is brought by Trust "for the benefit of the victim-beneficiaries of the AremisSoft Trust to recover damages caused by the wrongful conduct of UBS in knowingly providing substantial assistance to a massive, international fraud perpetrated on AremisSoft ... and its sharehold-

ers"); *id.* ¶ 11 (plaintiffs bring this action "to recover, on behalf of AremisSoft, money damages arising from Defendant's wrongful activity"), but plaintiffs' brief indicates that they are only bringing claims of the Company and not investor claims.

12. The Trust Agreement is attached as an exhibit to affidavits in the related cases against Lloyds and the Bank of Cyprus. Ac-

eries are to be distributed as follows: first the Trustee is to be paid; second, any debts must be satisfied; third, the reorganized debtor Softbrands, Inc. receives its share; and fourth, "Class Members" receive the remainder). Since damages are sought on behalf of these Trust beneficiaries, and since plaintiffs indicate that the former shareholders number more than 6000 persons, the Trust is clearly seeking damages "on behalf of" more than 50 persons. That SoftBrands is among these beneficiaries does not change the fact that the number is over 50.

In *Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir.2005), the Ninth Circuit analyzed a bankruptcy trust in a similar manner. The court referred to the defendants' position "that the Trustee's Action is brought 'on behalf of more than 50 persons or prospective class members,' i.e., the beneficiaries of the plan trust...." *Id.* at 1007. While the court went on to disagree with the defendants' position with regard to the entity exception and found that the trust in that case did count as a single entity, it did not disagree with this approach of looking to the trust beneficiaries to determine whether the action was brought on behalf of more than 50 persons. Presumably the court would not have reached the question whether the entity exception applied if it had not found that the trust beneficiaries numbered more than 50. In *Bordier*, similarly, Judge Pisano noted that the beneficiaries of the Trust (which is the same Trust as in the case at bar) numbered more than 50 persons. *See LaSala v. Bordier*, 452 F.Supp.2d at 590. The district court in *Cape Ann* came to a different conclusion with regard to the company claims asserted in that action, finding that they were not preempted because their "fundamental character" was corporate. *Cape Ann*, 296 F.Supp.2d at 12–13. I respectfully disagree with this analysis, however; while the court was correct that a corporate claim is distinct from a shareholder claim, SLUSA's definition of a covered class action does not concern itself with the nature of the claim being advanced but rather with the nature of the persons or entities on whose behalf damages are being sought. The character of the claim might well be relevant to the analysis at another stage, such as whether a defense of *in pari delicto* applies,[13] but it is not relevant at this stage. Here, since damages are indisputably being sought on behalf of beneficiaries of the Trust numbering more than 50 persons, the Trust is a covered class action unless the entity exception applies.

Next I turn to whether the entity exception applies. In the case before him, District Judge Pisano determined that the exception did not apply to the AremisSoft Corporation Liquidating Trust because the Trust was formed for the "primary purpose" of engaging in litigation, which he found satisfied the statutory language "for the purpose of participating in the action."[14] *See Bordier*, 452 F.Supp.2d at

cordingly, I take judicial notice of it for purposes of this motion against UBS. *See LaSala v. Lloyds*, No. 06 Civ. 4335, Ex. 10 to Decl. Marc J. Gottridge, dated Jul. 21, 2006 ("Gottridge Decl."); *LaSala v. Bank of Cyprus*, No. 06 Civ. 6673, Ex. 14 to Decl. John Fellas, in Supp. Def.'s Mot. Dismiss, dated Nov. 30, 2006 ("Fellas Decl.").

**13.** For my analysis of this defense, *see* Part II.C, *infra*.

**14.** It is clear that the trust need not be created for the purpose of participating in the *particular* legal action to count as a covered class action—the trust need only be created for the purpose of participating in litigation. *See Cape Ann*, 296 F.Supp.2d 4, 10 (D.Mass. 2003) ("The Trustee's argument that the Trust is a unitary entity because it was created not to pursue any particular action, but all 'such actions as necessary to recover on behalf of

582–84. I agree with Judge Pisano, who it should be noted presided over the initial class actions against AremisSoft and the genesis of this Trust in the Company's bankruptcy. Various provisions in the Trust Agreement indicate that while the Trust was empowered to accomplish multiple tasks, the chief among these was litigating the Trust claims. *See* Trust Agreement, at 1 ("The Trust is organized for the primary purpose of Liquidating the Trust Assets...."); Trust Agreement, at 3 ("WHEREAS, on July 1, 2002, the United States District Court for the District of New Jersey ordered the confirmation of the Plan, providing, among other things, for the establishment of a trust which will hold and prosecute the AremisSoft Causes of Action and the Class Claims...."); Trust Agreement, Art. I, § 1.3 "Purpose of Trust" ("The Trust is organized for the primary purpose of litigating the Trust Claims, distributing the proceeds of the Trust Claims and the Proceed Assets to the Class Members and liquidating its assets for the benefit of the Class Members...."). Because I conclude that the Trust was formed for the primary purpose of engaging in litigation, the entity exception does not apply.

Plaintiffs seek support for their position in *Smith*, where the court held that a bankruptcy estate was not a covered class action. However, in that case, the governing document setting forth the scope of the trustee's powers stated that it would "act as the Estates' representative for *all purposes,*" which included managing assets and winding up the estates. *Smith*, 421 F.3d at 1008 (emphasis in original). In other words, the prevalence of ordinary bankruptcy-related tasks in the mandate of the trust precluded a finding that it was organized for the primary purpose of litigating trust claims. This is not inconsis-

tent with my holding here, because the governing document of that trust was different. The mandate of the Trust in the case at bar more closely resembles that in *Cape Ann*, where the "Nutramax Litigation Trust," to which were assigned both the claims of an investors' syndicate and the claims of the failed company Nutra-Max, was created by the bankruptcy court during the company's Chapter 11 bankruptcy proceeding as a vehicle for pursuing any potentially recoverable assets. *See Cape Ann*, 296 F.Supp.2d at 8. The district court found that the trust agreement, whose primary purpose was described as "prosecuting the Causes of Action contributed to it ... and distributing to the Class 6 Beneficiaries [the Electing Shareholders] the assets of the Trust remaining after payment of all claims against or assumed by the Trust," indicated that the Trust was organized for the "primary purpose" of litigation. *See id.* at 10. The court therefore declined to find that the Trust was a unitary entity under the statutory exception and held that it was a covered class action. While this Court believes that the district court in *Cape Ann* should not have excluded the company claims from its analysis of trust claims, I am persuaded by the court's reasoning concerning SLUSA's entity exception. The origin of that trust, and the language of its governing document, are similar to those in the case at bar, and thus the *Cape Ann* court's reasoning supports my interpretation of the statutory language. The AremisSoft Corporation Liquidating Trust is not a single entity within the meaning of SLUSA.

For these reasons, plaintiffs' claims constitute a "covered class action."

### 2. Based on "State Law"

█ Count I of the complaint is brought under Delaware law. *See* Pl.'s

beneficiaries,' makes no sense conceptually or

legally.").

Mem. in Opp'n, at 12. In Part II.A.3.b, *supra,* I concluded that, applying New York choice of law analysis, the law of Switzerland governs this action. However, SLUSA requires only that the action "purports to be based on state law," *Webster,* 386 F.Supp.2d at 440, and plaintiffs at bar allege that state law applies. Thus the issue of what law actually applies (and whether Swiss law counts as "state" law for SLUSA purposes) need not be reached for my consideration of SLUSA's applicability to Count I, as this SLUSA requirement is otherwise satisfied.

However, I must consider that question for purposes of analyzing Count II, which explicitly invokes Swiss law. This is a question on which there is at present no authority. In *Kingdom 5–KR–41, Ltd. v. Star Cruises PLC,* No. 01 Civ. 2946, No. 01 Civ. 7670, 2004 WL 444554, at *3 n. 8 (S.D.N.Y. March 10, 2004), the court noted that the parties did not dispute the proposition "that foreign law is 'state law' for purposes of SLUSA." I agree with plaintiffs that the parties' mutual agreement in another case does not amount to authority on the question. *See* Pl.'s Mem. in Opp'n, at 25 n. 14. However, SLUSA was intended by Congress to "completely pre-empt" the field. *Felton v. Morgan Stanley Dean Witter & Co.,* 429 F.Supp.2d 684, 693 (S.D.N.Y.2006). It was created to close a loophole in the PSLRA that had been exploited by class action plaintiffs, and it was intended to do this "by making federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities and by mandating that such class actions be governed exclusively by federal law." *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 108 (2d Cir.2001). Congress's intention of making federal court the "exclusive venue" for class actions falling within its purview would be frustrated if actions that would otherwise be preempted if brought under

state law were permitted to proceed in state court by virtue of being brought under foreign law. I therefore treat Swiss law as state law for purposes of SLUSA.

### 3. SLUSA's Substantive Reach

After showing that plaintiffs' is a "covered class action" arising under "state law," defendant must still demonstrate that the substance of plaintiffs' claims falls within SLUSA's preemption. SLUSA only preempts actions in which a plaintiff alleges "an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security" or alleges "that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b). It is not disputed that this case concerns a "covered security." Only the first of the two substantive provisions is at issue. Plaintiffs argue that their allegations do not fall within SLUSA's substantive reach because they never alleged that the *defendant UBS* ever made a misstatement or omission with respect to securities—rather, the misrepresentations were made by others. *See* Pl.'s Mem. in Opp'n, at 23. Defendant responds that all that is required is that the complaint contain allegations of misrepresentations concerning securities:

> [A]llegations that the purchasers of AremisSoft stock were defrauded as a result of material misrepresentations form the basis of plaintiffs' allegations of breach of fiduciary duty, are alleged throughout the Complaint and specifically are incorporated in each Count of the Complaint. Thus, this case rests on allegations of exactly the type of underlying fraud scheme that SLUSA was designed to govern.

Def.'s Mem., at 14–15. Since this particular complaint is rife with allegations of

misrepresentations by Kyprianou and Poyiadjis, *see, e.g.* Compl. ¶ 22–69, defendant would have me conclude this satisfies SLUSA's requirement.

### a. SLUSA Analysis in this Circuit

Plaintiffs are correct that the conduct of defendant is still central to SLUSA analysis and that the mere allegation of misrepresentations somewhere in the complaint is not sufficient for SLUSA preemption. The Supreme Court's pronouncements that SLUSA should be interpreted broadly, relied on by the Bank, do not dislodge the relevance of defendant's conduct to the analysis. In *Dabit II* the Court stated, "[T]he identity of the plaintiffs does not determine whether the complaint alleges fraud in connection with the purchase or sale of securities. The misconduct of which respondent complains here—fraudulent manipulation of stock prices—unquestionably qualifies as fraud 'in connection with the purchase or sale' of securities...." *Dabit II*, 126 S.Ct. at 1515. The Court never indicated that the statute is so broad as to cut off any claim where the plaintiff happens to reference a misrepresentation in the complaint—regardless of whether it was central to the "misconduct of which respondent complains" on the part of the defendant in the action. In other words, while plaintiff's identity is not a critical component of SLUSA analysis, defendant's conduct is. *See also Paru v. Mut. of Am. Life Ins. Co.*, No. 04 Civ. 6907, 2006 WL 1292828 (S.D.N.Y. May 11, 2006) (claim of breach of fiduciary duty due to company's failure to prevent short-term trading in and out of mutual fund that allegedly harmed fund's long-term investors not preempted by SLUSA because it did not involve allegations of fraud by defendant).

In this Circuit, in order for a claim to be preempted by SLUSA, the *claim* must sound in fraud. *See Xpedior*

*Creditor Trust v. Credit Suisse First Boston (USA), Inc.*, 341 F.Supp.2d 258, 269 (S.D.N.Y.2004) (discussing this requirement and stating that "[a] claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim."). *See also Breakaway Solutions, Inc. v. Morgan Stanley & Co. Inc.*, No. Civ. A 19522, 2004 WL 1949300, at *8 (Del. Ch. Ct.2004) (breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, and indemnification claims not preempted by SLUSA where factual allegations concerning allocation of public offering shares did not sound in fraud). In *Xpedior*, Judge Scheindlin articulated a test that captures this requirement of a connection between the misrepresentations or omissions alleged in the complaint and the claim or claims being advanced. She observed, "Each of these courts applied what I will call the 'necessary component' test, wherein a court must determine whether the state law claim relies on misstatements or omissions as a 'necessary component' of the claim. In this context, 'necessary component' encompasses both technical elements of a claim as well as factual allegations intrinsic to the claim as alleged." *Xpedior*, 341 F.Supp.2d at 266. This test is applied to the substance, rather than the face, of plaintiff's claim. *Id.* at 268 ("[T]he real question was whether the claim was based on fraudulent conduct, regardless of the appearance of the word 'fraud' or 'misrepresentation.' "). Under the necessary component test, "a complaint is preempted under SLUSA only when it asserts (1) an explicit claim of fraud (*e.g.*, common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that 'sound in fraud.' " *Id.* at 266. Judge Scheindlin

found that none of plaintiffs claims—breach of contract, breach of the implied covenants of good faith and fair dealing, breach of fiduciary duty, or unjust enrichment—required misrepresentations or omissions as a necessary element, none of them sounded in fraud, and thus they were not preempted by SLUSA. *Id.* at 269; *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 443 (S.D.N.Y. 2001) (Marrero, J.) (plaintiff's claims for fraud, negligence, and negligent misrepresentation were "grounded on" alleged misstatements and therefore barred by SLUSA).

The test articulated in *Xpedior* is a sensible way of identifying the types of claims SLUSA was intended to preempt. If merely making allegations of fraud somewhere in the complaint were sufficient to bring the case within the reach of SLUSA, a class action complaint for commission of an environmental tort, that also alleged that the company fraudulently altered its books and thereby deceived shareholders, would be preempted, even if the claim against the defendant had nothing to do with securities fraud. Nevertheless, defendant is correct that the misrepresentation or omission at issue need not in all instances be *made by defendant* for SLUSA to preempt the claim. In the case of an aiding or abetting claim, where the underlying conduct that was aided or abetted sounds in fraud, it might be sufficient for the misrepresentation or omission at issue to have been made by the person allegedly aided and abetted by defendant. This was also Judge Pisano's conclusion, when, after framing the question before him as "whether SLUSA preempts state law aiding and abetting claims, where a third party, as opposed to the defendant, purportedly made actionable misrepresentations or omissions," he answered it in the affirmative. *Bordier*, 452 F.Supp.2d at 585.

In addition to requiring that the claim against defendant sound in fraud, SLUSA also requires that the misstatements or omissions alleged by plaintiffs be "in connection with the purchase or sale of securities." 15 U.S.C. § 77p(b)(1). With respect to the "in connection with" requirement, the Supreme Court stated in *Dabit II*, "[I]t is enough that the fraud 'coincide' with a securities transaction—whether by the plaintiff or by someone else. The requisite showing, in other words, is 'deception in connection with the purchase or sale of any security....'" *Dabit II*, 126 S.Ct. at 1513 (quotation and citation omitted). *See Winne*, 315 F.Supp.2d at 412 ("in connection with" requirement met because allegedly fraudulent fee charged by brokerage firm was intrinsic component of the security and affected its underlying value); *Korsinsky v. Salomon Smith Barney Inc.*, No. 01 Civ. 6085, 2002 WL 27775 (S.D.N.Y. Jan. 10, 2002) (positive recommendations on AT & T stock issued by research analysts at Salomon Smith Barney, made despite knowledge of AT & T's financial problems in order to boost Salomon's investment banking business, were "in connection with" purchase or sale of securities).

■ Where the alleged conduct giving rise to the claim is too far removed from a securities transaction, the "in connection with" requirement is not met. *See Norman v. Salomon Smith Barney, Inc.*, No. 04 Civ. 4391, 350 F.Supp.2d 382 (S.D.N.Y. June 9, 2004) (failure by defendant brokerage firm to reveal conflict of interests tainting its research analysts' recommendations, where plaintiffs never saw the analysts' reports with the alleged misrepresentations or relied on them in anyway, was not claim falling within SLUSA's purview); *Spielman v. Merrill Lynch, Pierce,*

*Fenner & Smith Inc.*, No. 01 Civ. 3013, 2001 WL 1182927 (S.D.N.Y. Oct. 9, 2001), *appeal dismissed,* 332 F.3d 116 (2d Cir. 2003) (while transaction fees charged by Merrill Lynch affected the cost of trading, they were "not sufficiently connected to the underlying securities to meet the requirement that the misrepresentation about those fees be 'in connection with' the purchase or sale of covered securities"); *Gavin v. AT & T Corp.*, 464 F.3d 634 (7th Cir.2006) (Posner, J.) (where alleged misconduct was due to letter's failure to inform shareholders of complete array of options following company's merger, fraudulent conduct cited in complaint was unconnected to securities); *Strigliabotti v. Franklin Res., Inc.*, 398 F.Supp.2d 1094, 1100 (N.D.Cal.2005) ("The fraud in question must relate to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the securities themselves. While the fraud in question need not relate to the investment value of the securities themselves, it must have more than some tangential relation to the securities transaction."); *French v. First Union Sec., Inc.*, 209 F.Supp.2d 818, 824 (M.D.Tenn.2002) (failure by broker to make statements regarding his qualifications or investment strategy not preempted by SLUSA) ("[I]n order for a breach to be 'in connection with' securities sales, the breach of the fiduciary duty must do more than simply implicate securities. Rather,

there must be a showing of a nexus between the fraud and a securities transaction.").

 These requirements that must be satisfied for SLUSA preemption to apply are, under the law of this Circuit, applied to each claim in the complaint rather than to the whole action. In *Bordier*, Judge Pisano disposed of the Swiss law claims in his SLUSA analysis by citing a Third Circuit case holding that SLUSA preempts entire actions and not claims. *See Bordier*, 452 F.Supp.2d at 577 n. 1 (citing *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 298 (3d Cir.2005)). This is not the law of this Circuit. In *Dabit I*, the Second Circuit dismissed one of the plaintiff's claims as preempted by SLUSA but not the other. The court noted that defendant's interpretation that maintenance of an entire action is prohibited so long as a complaint included some allegations triggering preemption would lead to the result that "SLUSA would effectively preempt any state law claim conjoined in a given case with a securities fraud case, whatever its nature." *Dabit I*, 395 F.3d at 47. The court declined to adopt that reading because "the historic police powers of the states are not preempted unless it was Congress's 'clear and manifest purpose' to do so." *Id.* When the Supreme Court overruled *Dabit I*, it was on other grounds, and thus I take the Second Circuit's claim/action analysis to be the law of the Circuit.[15]

---

15. Additionally, the Second Circuit expressly decided the question in *Gray v. Seabord Sec., Inc.*, 126 Fed.Appx. 14, 16, 2005 WL 551477 at *1 (2d Cir.2005) (rejecting argument that preemptive provision of SLUSA requires dismissal of entire action that includes one or more preempted claims). While *Gray* is an unpublished summary order, and Local Rule § 0.23 prevented the parties from citing this case in their briefs, I agree with Judge Lynch in finding "the opinion of a distinguished Second Circuit panel highly persuasive, at

least as worthy of citation as law review student notes, and eminently predictive of how the Court would in fact decide a future case such as this one." *Harris v. United Fed'n Teachers, New York City Local 2,* 02 Civ. 3257, 2002 WL 1880391, at *1 n. 2 (S.D.N.Y. Aug. 14, 2002). Local Rule § 0.23 has since been superseded by new Fed. R.App. P.32.1, which prohibits federal courts from disallowing the citation of unpublished opinions, but the new Rule 32.1 only applies to decisions issued "on or after" January 1, 2007.

The Supreme Court in *Dabit II* did not express a view as to the Second Circuit's position on the action/claim analysis. However, UBS relies upon a recent opinion from the District of New Jersey in which District Judge William J. Martini considered the question at some length and concluded that the plain language of the statute and the Supreme Court's opinion in *Dabit II* supported the interpretation that SLUSA preempts entire actions and not merely claims. *See In Re Lord Abbett Mut. Funds Fee Litig.*, 463 F.Supp.2d 505 (D.N.J.2006). In Judge Martini's view, the Supreme Court "weakened, if not undercut entirely, the Second Circuit's reading in *Dabit I* that SLUSA only preempts claims and not entire actions," because the Court stated that the presumption against preemption of state law claims did not possess the same force in the SLUSA context. *Id.* at 513. Since the Second Circuit had relied upon that presumption in its claim/action analysis, Judge Martini's reasoning ran, the Supreme Court effectively eviscerated the basis for the Second Circuit's separate consideration of claims. I am not entirely in agreement. The Court in *Dabit II* stated:

> In concluding that SLUSA pre-empts state-law holder class-action *claims* of the kind alleged in Dabit's complaint, we do not lose sight of the general presum[ption] that Congress does not cavalierly pre-empt state-law *causes of action*. But that presumption carries less force here than in other contexts because SLUSA does not actually pre-empt any state *cause of action*. It simply denies plaintiffs the right to use the class action device to vindicate certain *claims*.

*Dabit II*, 126 S.Ct. at 1514 (emphases added). In my estimation, the Court's own explanation of SLUSA's operation describes the statute as preempting claims

and not actions. While I read the Supreme Court's dicta in *Dabit II* differently than does Judge Martini, *Dabit II* falls short of a ruling by the Supreme Court that SLUSA preempts claims rather than actions or vice versa.

Plaintiffs, for their part, bring to my attention a recent case ostensibly shedding light on this question. In *Jones v. Bock*, —— U.S. ——, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), the Supreme Court held that the Prisoner Litigation Reform Act ("PLRA") preempts claims and not entire actions. *See Jones*, 127 S.Ct. at 923–24 (PLRA, which provides that "no action shall be brought" unless administrative procedures have been exhausted, only requires dismissal of claims that have not properly been properly exhausted—not dismissal of an entire action if a claim or claims within it have not been properly exhausted). Defendant argues that the PLRA is a different statutory scheme altogether and the Court's analysis of it may not be applied wholesale to SLUSA. On the other hand, plaintiffs point to several general principles outlined by the Court that signal disapproval of dismissing entire actions as a general rule: "This statutory phrasing—'no action shall be brought'—is boilerplate language.... More generally, statutory references to an 'action' have not typically been read to mean that every claim included in the action must meet the pertinent requirement before the 'action' may proceed." *Id.* at 924. Finally, plaintiffs point to language addressing principles for dismissal of the complaint: "As a general matter, if a complaint contains both good and bad claims ... [o]nly the bad claims are dismissed; the complaint as a whole is not. If Congress meant to depart from this norm, we would expect some indication of that, and we find none" (quotation and citations omitted). *Id.* While this language about "norms" for in-

terpreting statutory language concerning dismissal of a complaint reinforces my interpretation of SLUSA, I still cannot say that such language definitively decides the claim/action question within the SLUSA context.

In the absence of clear indication from the Supreme Court, I am bound by existing Second Circuit law, until such time as the Second Circuit should change its mind or the Supreme Court decide the question squarely. Accordingly, I consider plaintiffs' claims separately. Only those that are supported by allegations that fall within the scope of SLUSA's preemption are preempted.

### b. Application of SLUSA's Requirements to Plaintiffs' Claims

Count I of the complaint is for "aiding and abetting breach of fiduciary duty." To analyze this claim, I must look to the underlying conduct by Kyprianou and/or Poyiadjis that the Bank is alleged to have aided and abetted. The complaint exhaustively details the fraudulent scheme by Poyiadjis and Kyprianou to drive up the price of AremisSoft shares, cash in their shares, conceal the proceeds of their illegal sales by using shell entities to mislead the public into thinking that the stock sales were arm's length sales by ordinary investors, and then shuffle the funds between various bank accounts so that it ultimately arrived in their pockets. Compl. ¶¶ 22, 85. UBS's alleged role with respect to this scheme was only in conjunction with the last step in which proceeds of the fraud were shuffled between banks. See, e.g., id. ¶ 6 (UBS was aware that an account was being used in manner "designed to conceal the proceeds of illegal conduct"); id. ¶ 120 ("UBS agreed to take possession of the proceeds from the illegal sale of AremisSoft shares and hold it for the benefit of the Poyiadjis family."); id. ¶ 155 ("Au-

thorized representatives and/or employees of UBS knew that Kyprianou and Poyiadjis had committed fraud which resulted in numerous breaches of fiduciary duty and, nevertheless, provided substantial assistance to Kyprianou's and Poyiadjis' scheme to misrepresent the true financial nature of AremisSoft, profit from the sales of shares of AremisSoft at artificially inflated prices, and then conceal their ill-gotten proceeds by laundering the proceeds through the UBS account.").

I conclude that this claim against UBS sounds in fraud, as fraud is an integral part of the conduct on the part of Kyprianou that gives rise to the claim. However, I do not conclude that UBS's alleged aiding and abetting conduct "coincided" with a securities transaction. UBS received the tainted funds from Bordier and Dominick, two Swiss private banks that had assisted in the conversion of shares to cash. See, e.g., Compl. ¶ 130. It is alleged that UBS knew the funds were tainted and nonetheless assisted the Cypriots by holding the funds for a period of time and then transferring them to other accounts when directed. Compl. ¶¶ 89, 124–40. If UBS had facilitated the sale of the AremisSoft shares, then conceivably the bank could be tied to the portion of the swindlers' scheme that involved securities fraud, as the sale of shares by the shell entities was a crucial last step, without which the securities fraud could not have been completed. But the facts alleged make clear that all the money handled by UBS came from other banks *after* the shares had been sold.

Kyprianou and Poyiadjis did many bad acts; but the Bank is only implicated in some of them, and these are not securities fraud of the type covered by SLUSA. Thus, because the conduct by Kyprianou and Poyiadjis in which the Bank is implicated here is too far removed from a securities transaction to be said to have "coin-

cided" with it, Count I of the complaint is not preempted by SLUSA.[16] *Cf. Gavin,* 464 F.3d at 639 ("Of course there is a literal sense in which anything that happens that would not have happened but for some prior event is connected to that event. In that sense the fraud of which the plaintiff complains is connected to the merger, without which there would not have been such a fraud against the plaintiff and her class. But in the same sense the fraud is connected to the Big Bang, without which there would never have been a MediaOne or even an AT & T.").

 Count II of the complaint is a tort claim arising under Swiss law for violation of various Swiss statutory provisions. For this claim, which is not an aiding and abetting claim, defendant must be alleged to have made the misrepresentations or omissions required by SLUSA in order for the claim to sound in fraud. The complaint, however, does not allege that the Bank made any misrepresentations or omissions of material fact—rather that the Bank failed to take certain *actions* required of banks by Swiss law. As the complaint states:

> UBS never took the action required by Swiss law in the circumstances to verify the identity of the beneficial owners of the assets in the accounts or the origins of those assets, which they were told were being held for the benefit of members of the Poyiadjis family. Specifically, UBS did not ask any questions when

their authorized representatives learned that substantial assets belonging to Kyprianou were being held in the accounts purportedly belonging to members of the Poyiadjis family. Similarly, UBS did not ask any questions when money was transferred into the account or when numerous, substantial, and frequent transfers were made between and among accounts holding assets owned by the same individuals. UBS failed to make any inquiries even after the value of the Bulgarian Contract was called into doubt, nor did they make any inquiries after the massive fraud was reported in the media and class action lawsuits were filed.

Compl. ¶ 88. None of these allegations sounds in fraud, as fraud is not an integral part of the conduct underlying the claim. Thus Count II does not fall within SLUSA's reach.

Accordingly, neither of plaintiffs' counts is preempted by the statute.

## C. *The Doctrine of In Pari Delicto*

Under my analysis, plaintiffs' claims, which are the claims of AremisSoft, survive SLUSA preemption. Whether the Trustees, who are empowered by the Trust Agreement to bring the company claims, *may* in fact bring them, or whether these claims are barred under another theory, is a separate question unrelated to SLUSA.

---

**16.** I note that nothing in my holding is intended to suggest that SLUSA could not preempt a claim for aiding and abetting a breach of fiduciary duty, so long as the defendant's conduct is alleged to be in furtherance of the type of misrepresentation or omission contemplated by SLUSA. *See In re NYSE Specialists Sec. Litig.,* 405 F.Supp.2d 281, 308 (S.D.N.Y.2005) (count alleging breach of fiduciary duty and/or aiding and abetting breach of fiduciary duty preempted by SLUSA because "the Complaint's allegations demonstrate that these claims are based on fraudulent conduct"); *In re Eaton Vance Mut. Funds Fee Litig.,* 380 F.Supp.2d 222, 242 (S.D.N.Y.2005) (dismissing count for aiding and abetting breach of fiduciary duty as preempted by SLUSA); *Prof'l Mgmt. Assocs., Inc. Employees' Profit Sharing Plan. v. KPMG, LLP,* 335 F.3d 800, 803 (8th Cir.2003) (claims against accounting firm preempted by SLUSA where complaint alleged, *inter alia,* that the firm aided and abetted company's breaches of fiduciary duty).

In the case at bar, the Bank asserts a defense based upon the doctrine of *in pari delicto*. Literally meaning "in equal fault," the common law defense of *in pari delicto* bars a plaintiff from recovering a loss caused in part by his own wrongful conduct.[17] *UCAR Int'l Inc. et al. v. Union Carbide Corp.*, No. 00 Civ. 1338, 2004 WL 137073, at *10 (S.D.N.Y. Jan. 26, 2004). A plaintiff is prohibited from bringing a claim where it was an "active, voluntary participant in the unlawful activity that is the subject of the suit." *Granite Partners*, 17 F.Supp.2d at 308 (quotation marks omitted). The principles grounding the defense are twofold: (1) courts should not provide a forum to resolve disputes between wrongdoers; and (2) precluding relief to an admitted wrongdoer will have a deterrent effect on illegal conduct. *Id.*

Defendant asserts that AremisSoft clearly was a wrongdoer, as the Company admitted in a filing with the SEC that "AremisSoft has failed to comply with . . . Rule 10b–5 . . . by making materially false and misleading statements and material omissions in filings with the Commission and press releases." *See* Def.'s Reply Mem., at 5 (quoting *In re AremisSoft*, Admin. Proc. File No. 3–10854, SEC Release No. 46285, 78 S.E.C. Docket 346 (July 31, 2002), *available at* http://sec.gov/litigation/admin/34–46285.htm). However, the SEC Order also states that AremisSoft submitted its Offer of Settlement "[s]olely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, without admitting or denying the findings set forth below."

*Id.* Moreover, plaintiffs argue that even though Poyiadjis and Kyprianou were agents of AremisSoft, their wrongdoing should not be imputed to the Company because they were acting with interests entirely adverse to those of the Company. Pl.'s Mem. in Opp'n, at 25. Plaintiffs rely on an exception known as the "adverse interest" exception, which applies when the agent has "totally abandoned his principal's interests and [is] acting entirely for his own or another's purposes." *In re CBI Holding Co., Inc.*, 311 B.R. 350, 369 (S.D.N.Y.2004) (internal quotation marks and citation omitted).

In *pari delicto* is a question of state law. *See Granite Partners*, 17 F.Supp.2d at 306 n. 16 (New York law determines applicability of *in pari delicto* defense because its substantive law applies to the claim). While plaintiffs cite no cases involving agency principles under Delaware law, the law that they maintain applies to this case,[18] the intricacies of Delaware agency law—or indeed of any U.S. state law—are not at issue here. Since I have found that Swiss law applies, *see supra* Part II.A.3.b., this defense may or may not be available to defendant. Judge Kaplan came to a similar conclusion with regard to a related doctrine involving agency principles in a case involving North Carolina law: "The question whether the Parmalat Debtors are chargeable with the fraud allegedly perpetrated by the companies' former management, and thus whether Bondi is subject to a defense of *in pari delicto*, is governed by the law of North Carolina." *In re Parmalat Sec. Litig.*, 383 F.Supp.2d at 595. Consequently, he found

---

**17.** It is derived from the Latin maxim *in pari delicto potior est conditio defendentis*, meaning that "in the case of equal or mutual fault . . . the position of the [defending] party is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985).

**18.** The cases cited by plaintiffs all arise in the Southern District of New York, and they discuss the agency principles relevant to *in pari delicto* analysis with respect to New York, Pennsylvania, and North Carolina law.

that a New York case relied on by the defendant "is simply not controlling here." *Id.* As I am not in possession of evidence concerning Swiss law on this question (such as what principles Switzerland's agency law employs to determine whether the conduct of Poyiadjis and Kyprianou are to be imputed to AremisSoft), I decline to consider the applicability of the *in pari delicto* doctrine.

### D. *12(b)(6) Failure to State a Claim*

I also do not reach defendant's third ground for dismissal in its motion, namely, failure to state a claim upon which relief may be granted. Because I have found that the law of Switzerland applies to plaintiffs' claims, and that the preference for a foreign court's deciding questions of foreign law is a factor in my dismissal on the basis of *forum non conveniens*, it would not be appropriate for the Court to conduct a Rule 12(b)(6) analysis on the basis of Swiss law, particularly where that law is unsettled.

### III. CONCLUSION

For the foregoing reasons, and in the exercise of my discretion, I grant defendant's motion to dismiss on the ground of *forum non conveniens* only, and dismiss the complaint without prejudice to the merits of plaintiffs' claims.

That dismissal is conditioned upon the defendant UBS appearing and defending on the merits, without interposing a statute of limitations, an action asserting claims arising out of these facts, by the plaintiff Trustees in the courts of Switzerland, failing which plaintiffs may apply to restore the case to this Court's calendar.

It is SO ORDERED.